[No. A093189. First Dist., Div. Five. Dec. 6, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
RODOLFO PUEBLA NAPOLES et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, parts I.B. through IX. of this opinion are not certified for publication.

COUNSEL .

Michael B. Dashjian, under appointment by the Court of Appeal, for Defendant and Appellant Rodolfo Puebla Napoles.

Patricia N. Cooney, under appointment by the Court of Appeal, for Defendant and Appellant Teresa Rodriguez.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, René A. Chacón and Laurence K. Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMONS, J.**—Defendants Rodolfo Puebla Napoles (Father) and Teresa Rodriguez (Mother)[1] were found guilty of one count of felony child abuse following a joint jury trial. (Pen. Code, § 273a, subd. (a).) The trial court denied probation, sentencing Mother to prison for the four-year middle term and Father to prison for the six-year maximum term. In this appeal, defendants raise a host of challenges to the proceedings below. In the published portion of this opinion, we address two related contentions: that the trial court erred by failing to give a jury unanimity instruction and compounded that error by instructing that unanimity was not necessary. We conclude that no unanimity instruction was required, the instruction actually given was

---

[1] Mother's last name is spelled as "Rodrigues" on the information, verdict, minutes of the sentencing hearing and abstract of judgment. The latter two documents show an also known as spelling of "Rodriguez." We use the latter spelling based on Mother's sworn testimony.

erroneous, but the error was harmless. In the balance of the opinion, we examine each of the other arguments raised by defendants and conclude no reversible error occurred.[2]

## FACTUAL BACKGROUND

█ We view the evidence in the light most favorable to the judgment and presume the existence of every fact the trier could reasonably deduce from the evidence that supports the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) The following summary is based on this appellate standard of review.

On May 11, 2000, Mother brought the victim, her three-and-one-half-month-old baby, into the emergency room at St. Rose Hospital in Hayward. The baby was crying and panting and the crying increased whenever she was moved. Nurses noted a large deformity of the left thigh, which lay at an odd angle and was swollen, and bruises on the baby's body and face. Nodules or bumps could be seen and felt around the rib cage consistent with prior fractures. Stabilizing measures were begun and morphine was administered for pain. X-rays were taken in the emergency room and the left leg was splinted to immobilize it. The baby was then transferred by ambulance from the emergency room at St. Rose to Children's Hospital in Oakland, where she was admitted the same day.

The police were notified by hospital personnel, and a detective arrived at the hospital. He interviewed both defendants separately on May 11, 2000, and on several occasions after that date.[3] During the interviews, Father attributed the baby's facial bruising and the leg injury to an accident that had occurred on May 9, two days before the baby was taken to the hospital. He had been carrying the baby when a bicyclist almost hit him, causing him to fall with the baby in his arms. Mother confirmed that on May 9, Father had given her the same explanation. Both parents stated that they had agreed that the leg injury was not serious enough to take the baby to the hospital until May 11. On June 7, after the detective asked Father about skull fractures suffered by the baby, Father explained that the baby had fallen from a bed (about three feet off the floor) approximately one month before she was taken to the hospital. Aside from these explanations, both parents denied inflicting any injuries on the child, seeing anyone else inflict such injuries or believing that the child was in pain or needed medical treatment before May 11.

---

[2]In a separate petition for writ of habeas corpus, case No. A097425, Mother has raised a number of claims challenging the competence of her trial counsel. We have denied that petition by separate order filed this date.

[3]The statements by each defendant made to Munoz were admitted only against each declarant.

Dr. James Crawford, a board certified pediatrician and the medical director of the child abuse unit at Children's Hospital, was the chief prosecution witness. Dr. Crawford testified about the numerous severe injuries inflicted on the baby during a two-month period. The left femur had been fractured in a fashion that led the doctor to conclude that a twisting force had been applied. Such an injury is categorically uncommon in a three-month-old infant, who is unable to walk. The doctor further testified that a baby's fall, while cradled in the arms of an adult, could not explain such a fracture absent the leg twisting away from the holder's body. Once fractured, the bone pieces would have pressed against soft tissue, causing excruciating pain every time the leg was moved until its immobilization. X-ray findings of bone calcification at the fracture site, indicating significant delay in bringing this obvious leg fracture for treatment, was indicative of child abuse inasmuch as it suggested that the persons who delayed obtaining medical care were afraid of the consequences if the injury was identified. The left femur also exhibited a second fracture, which the doctor believed was caused by violent shaking. Based on X-ray evidence of bone calcification at the fracture sites, both fractures of the left femur likely occurred between May 4 and May 6, 2000. Both fractures of the left leg would have been extremely painful during the five-to-seven-day delay in treatment.

Dr. Crawford also testified that the baby suffered fractures of the parietal bones on each side of her skull. These skull fractures required very significant blunt force trauma akin to hitting a windshield in a high-speed car crash, sustaining a multistory fall or having something strike the child's head. A three-month-old baby typically could not roll off a bed by herself, and the doctor did not believe a fall from a bed would cause these skull fractures. Likewise, a fall of a person while cradling the baby would not generate sufficient force to cause these skull fractures. A massive trauma, such as a person falling onto the baby's skull, would have been necessary. These injuries would have resulted in soft tissue swelling, bruising and pain. The baby would have "screamed her head off" at the time of her injury. The fractures occurred a week or more before the May 11, 2000 hospitalization, by which time the swelling had reduced but not disappeared. The skull fractures had not substantially healed when the doctor first examined the baby, and movement of these bones would still have been uncomfortable for the baby.

X-rays also confirmed rib fractures, transverse fractures to the radius of both arms and two separate fractures of the right shin bone. Each would have been very painful. The baby displayed residual bruising around her nose and eyes and a complex bruise on the left cheek. The latter was a human bite mark which could not have been inflicted through gentle or playful contact.

The other bruises to different sides of the face evinced multiple blunt injuries from different blows. The doctor could not conceive of a nonhuman mechanism that would explain the injuries to the face and head. Considered in context with the other injuries, they appeared intentional.

The baby's bones had completely healed four months after hospitalization. This ruled out the possibility that the baby suffered from any bone-weakening condition. Apart from the fractures, the baby's bones appeared completely healthy upon her admission to Children's Hospital and thereafter.

In the doctor's opinion, the baby had been intentionally assaulted very violently, through a variety of different mechanisms, resulting in at least a dozen broken bones. In addition, the baby received significant soft tissue injuries resulting from blows to the head and from a bite to the face. The constellation of injuries, the repetitive nature and varying ages of the injuries, as well as the different mechanisms of injury, and the fact that different organ systems were involved was "absolutely and utterly diagnostic of child abuse." Furthermore, the failure to report old injuries that were discovered only when treating the femur fractures was indicative of deception, as was the medical history given by Mother that did not fit the medical evidence.

The prosecution also called three different women who had cared for the baby while Mother and Father worked. Each was a friend of the defendants or a family member. Each described bruising they had seen on the baby.

Mother testified in her own defense and denied having seen evidence of broken bones. Father played with the baby and seemed happy with her, while Mother hardly played with her at all. She never noticed bruising, swelling or tenderness in the arms, shinbone or side of the skull, and never noticed anyone handle the baby in a way that could injure her in those places. Mother had noticed little bumps on the baby's ribs, but since the baby did not react to being held around her rib cage, Mother did not take her to the hospital. Mother never saw anyone shake the baby. On May 7, 2000, Father did "bite her, but slowly," while giving the baby playful kisses, which resulted in a bruise on the baby's cheek. Mother was present and saw that the baby did not react. Mother attributed the thigh fracture and the bruises on the nose and forehead to the May 9 bicycle incident. Mother testified that, following this accident, the baby was calm and quiet and did not react to diaper changes or to being picked up. On May 11, Mother took the baby to the hospital because the swelling was not lessening. Aside from the injuries in the bicycle accident, Mother did not know what caused any of the broken bones. She insisted she did not injure the baby in any way and had no reason to believe Father did so.

Father testified in his own defense and denied knowing how the fractures occurred, or seeing symptoms of them. He observed nothing that made him suspicious that the baby was being abused. He denied the report of one neighbor that he would often play loud music while the baby cried. About one month before May 11, 2000, defendants noticed that anytime anyone picked up the baby, she cried a short while, as if she did not like being moved. Father had noticed a lump near the baby's left rib cage and a coin-sized bruise on the baby's left wrist, but did not believe that either warranted medical treatment. On May 6 or 7, Father was playing with the baby and held his lips to her cheek and sucked on her skin. He did not bite the baby or put his teeth on her and did not know what caused the teeth marks to be on her cheek.

Father described an incident in mid-April 2000, when the baby fell from a bed but was not injured. Father also described the bicycle collision, which occurred two days before May 11. He testified that no twisting force was applied to the baby's leg, and the leg injury could not have happened from the fall. The baby's face scraped the pavement a little bit, although she was still cradled when the fall ended. She cried for about 20 minutes, then stopped. He saw no swelling on the leg.

After more than two full days of deliberations, the jury returned guilty verdicts against both defendants.

## DISCUSSION

### I. Claims of Instructional Error

#### A. Unanimity Instruction

Defendants in criminal cases have a constitutional right to a unanimous jury verdict. (*People v. Jones* (1990) 51 Cal.3d 294, 305 [270 Cal.Rptr. 611, 792 P.2d 643].) From this constitutional principle, courts have derived the requirement that if one criminal act is charged, but the evidence tends to show the commission of more than one such act, "*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534 [70 Cal.Rptr.2d 878], italics added; accord, *People v. Jenkins* (1994) 29 Cal.App.4th 287, 298-299 [34 Cal.Rptr.2d 483].) Relying on this "either/or" requirement, defendants contend the trial court erred by failing to give the unanimity instruction set out in CALJIC

No. 17.01.[4] Further, they argue that even if no unanimity instruction was required, the court committed reversible error by giving the jury a "non-unanimity instruction." We reject each contention. Although we agree that the trial court erred in giving the non-unanimity instruction, the error was harmless.

### 1. *No Unanimity Instruction Was Required*

In this case, defendants correctly note that while only one count of abuse was alleged, many separate acts and omissions that might constitute abuse were proved. Thus, they argue, the either/or requirement was triggered.[5] We disagree. Even when the prosecution proves more unlawful acts than were charged, no unanimity instruction is required where the acts proved constitute a continuous course of conduct. (*People v. Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971].) " 'This exception arises in two contexts. The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.] [¶] This second category of the continuous course of conduct exception has been applied to a limited number of varying crimes, including . . . child abuse [citation].' [Citation.]" (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1309 [18 Cal.Rptr.2d 511].) In *People v. Rae* (2002) 102 Cal.App.4th 116 [125 Cal.Rptr.2d 312], this court explained that this second category requires an examination of the statutory language at issue in order " ' "to determine whether the Legislature intended to punish individual acts or entire wrongful courses of conduct." ' [Citation.] When the language of the statute focuses on the goal or effect of the prohibited crime, the offense is a continuing one. [Citation.]" (*Id.* at p. 123.) With each category of the continuous course of conduct exception, no unanimity instruction is required

---

[4]CALJIC No. 17.01 (6th ed. 1996) provides: "The defendant is accused of having committed the crime of _____ [in Count _____]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count _____] may be based. Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count _____], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

[5]Defendants also appear to argue that the either/or requirement arose because defendants could be convicted under different theories of liability. That is, some jurors might believe Father was guilty of directly inflicting an injury on the child, while others disagreed but believed he was guilty of ignoring the child's suffering. We reject this contention. Juror unanimity is not required simply because different theories of liability are presented. (*People v. Russo* (2001) 25 Cal.4th 1124, 1135 [108 Cal.Rptr.2d 436, 25 P.3d 641]; *People v. Santamaria* (1994) 8 Cal.4th 903, 918-919 [35 Cal.Rptr.2d 624, 884 P.2d 81]; *People v. Vargas* (1988) 204 Cal.App.3d 1455, 1465 [251 Cal.Rptr. 904].)

because the multiple acts constitute a single criminal event. (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 631 [114 Cal.Rptr.2d 437].)

Of course, child abuse is not invariably charged as a course of conduct offense; one act or omission constituting abuse may be sufficient for conviction. *Russo* is instructive in determining whether a unanimity instruction is required. In *Russo*, our Supreme Court concluded that the purpose of the unanimity instruction governs its use. "The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [the defendant] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo, supra,* 25 Cal.4th at pp. 1134-1135.)

■ Two related factors contribute to our decision that the purpose behind the unanimity instruction would not be served by requiring it in this case. First, when the accusatory pleading alleges one violation of Penal Code section 273a, subdivision (a) (hereafter section 273a(a)) for misconduct occurring between two specified dates, "[t]he issue before the jury [is] whether the accused was guilty of the course of conduct, not whether he had committed a particular act on a particular day." (*People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299].) Second, "[w]here . . . the evidence establishes a pattern of physical trauma inflicted upon a child within a relatively short period of time, *a single course of conduct is involved* and no justification exists for departing from the well-established rule . . . that jury unanimity is not required as to the underlying conduct constituting the violation of section 273a." (*People v. Vargas, supra,* 204 Cal.App.3d at p. 1464.) In *Vargas,* "burns, bruises, contusions, whipping injuries, and bites [were] inflicted within a . . . *10-day period.*" (*Id.* at p. 1462.) In *Ewing,* the conviction rested on evidence of "scratches, scalds, burns and bruises . . . and three separate subdural hematomas, one of which proved fatal," that occurred over a three-month period. (*Ewing,* at p. 716.)

Application of these principles to the facts in our case demonstrates that no unanimity instruction was required. The information accused the defendants of "a violation of [section 273a(a) occurring] on or between January 30,

2000 through May 11, 2000." This language alerts the jury that the charge consists of a continuous course of conduct, to be proved by evidence of more than one individual act. Thus, from the trial's inception, the jury was aware that this was not a case where one illegal act is charged and several are proven—a case, in other words, requiring a special instruction to protect the defendant's right to a unanimous jury.

In addition, the evidence presented was consistent with the theory alleged in the information. As in the *Ewing* and *Vargas* cases, evidence of the injuries inflicted and an opinion as to their cause was provided by medical professionals. Here, Dr. Crawford testified that over a period of approximately two months the baby was subjected to numerous violent assaults, which caused major injuries (including 12 broken bones) and excruciating pain. Dr. Crawford also testified that the number, repetitive nature and varying ages of the injuries were "absolutely and utterly diagnostic of child abuse." Like those in *Vargas*, the injuries inflicted on the baby in this case "suggest a systematic pattern of abuse rather than separate, isolated incidents." (*People v. Vargas, supra,* 204 Cal.App.3d at p. 1463.)

Based on the language of the charging document and the evidence presented, we believe that any jury disagreement would have been focused on the exact way the charged offense was committed and not on whether one of several discrete crimes had occurred. Thus we find no error in the trial court's refusal to give a unanimity instruction.

### 2. *The Court Erred by Giving the Non-unanimity Instruction*

At the prosecutor's behest, the court instructed the jury that: "The crime charged, or the lesser included offense, may be violated by a single act or by a series of acts. It is not necessary for all of the jurors to agree that a defendant committed the same act or acts or omission or omissions." Relying on *People v. Culuko* (2000) 78 Cal.App.4th 307 [92 Cal.Rptr.2d 789], the People argue in this appeal that if, in fact, jury unanimity as to specific acts is not required, then the court may so instruct. While we do not quarrel with this argument as a general proposition, its logical corollary is that the instruction must properly describe the law. This one did not.

*Culuko* provides an example of a correct instruction on the extent to which the jury need *not* agree when finding a defendant guilty. In *Culuko*, the defendants were charged with the abuse and murder of the child of one of them. The court gave an aiding and abetting instruction and also instructed the jury that, " 'Those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of

that crime. *You need not unanimously agree, nor individually determine, whether a defendant is an aider or abettor or a direct perpetrator. [¶] The individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.'"* (*People v. Culuko, supra,* 78 Cal.App.4th at p. 321, italics added.)

The law is well established that jurors are not required to agree on the specific theory of guilt. (See fn. 5, *ante,* p. 115.) Therefore, no unanimity instruction is required when the jury is presented with such alternative theories. (*People v. Melendez* (1990) 224 Cal.App.3d 1420, 1432 [274 Cal.Rptr. 599], disapproved on other grounds in *People v. Majors* (1998) 18 Cal.4th 385, 408 [75 Cal.Rptr.2d 684, 956 P.2d 1137].) In *Culuko,* the court's decision to take an additional step and inform the jury that unanimity was unnecessary was upheld because the instruction accurately explained this. (*People v. Culuko, supra,* 78 Cal.App.4th at pp. 323-324.)

As we earlier discussed, child abuse may consist of either a continuous course of conduct or a specific act or omission. A jury may only convict without unanimous agreement as to a specific act when a continuous course of conduct is at issue. When the jury is permitted to convict for a specific act and more of such acts are proved than charged, the interests implicated by the either/or rule are triggered. Here, the charge and the evidence clearly presented a course of conduct for the jury's consideration. The non-unanimity instruction, however, "unpackaged" the course of conduct by informing the jurors that the defendants could be convicted for a *single* act (or omission), and then informed them that unanimous agreement on the specific act or omission found unlawful was unnecessary. In measuring the effect of this instruction, we presume that jurors are intelligent people, capable of understanding the instruction and applying it to the facts of this case. (*People v. Tatman* (1993) 20 Cal.App.4th 1, 10-11 [24 Cal.Rptr.2d 480].) Since evidence was presented of more than one specific act, reasonable jurors would have understood that a conviction was permissible if different sets of jurors believed a defendant committed different single acts or omissions constituting abuse, without all 12 agreeing on the commission of any single violation.[6] Such a result would violate the criminal defendant's right to a

---

[6] In our case, the challenged instruction could lead to a conviction in the following situations: (1) Several jurors could believe that Father directly inflicted the injury to the baby's left leg, while the remainder, who believe he did not, could reach the conclusion he directly inflicted the skull fractures. (2) Several jurors could believe Mother indirectly abused the baby when she failed to obtain prompt medical attention for the left leg injury, while the

unanimous verdict. Thus we conclude the court erred in giving this particular non-unanimity instruction.[7]

### 3. *The Error Was Harmless*

The erroneous failure to give a unanimity instruction is harmless if disagreement among the jurors concerning the different specific acts proved is not reasonably possible.[8] (*People v. Burns* (1987) 196 Cal.App.3d 1440, 1458 [242 Cal.Rptr. 573]; accord, *People v. Brown* (1996) 42 Cal.App.4th 1493, 1500-1502 [50 Cal.Rptr.2d 407] [The failure to give a unanimity instruction is harmless unless there is evidence from which reasonable jurors could both accept and reject the occurrence of at least the same number of acts as there are crimes charged.]; see also *People v. Stankewitz* (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].) *People v. Jones, supra,* 51 Cal.3d at pages 307, 321-322, is instructive. The *Jones* court considered the effect of the jury unanimity requirement on child molest prosecutions, in which the young victim testifies to more offenses than charged and the testimony is generic in nature, devoid of specific details regarding the time, place and circumstances of the many assaults. In *Jones,* the defendant had been charged with 28 acts of molestation of four children, including six acts of molesting one of them. That child testified that he had, in fact, been molested once or twice a month for a period of 23 months. (*Id.* at p. 302) The defendant testified, denied molesting any of the victims, and provided a motive for the victims to fabricate their stories. (*Id.* at p. 303.) The *Jones* court noted that credibility was the "true issue" in the case, as it commonly

---

remainder, who disagree, could believe she abused the baby by failing to seek treatment for the skull fractures.

[7]In child abuse cases where a course of conduct is prosecuted and juror unanimity is not required, it would seem the wiser course to give no instruction, rather than attempt a direction on non-unanimity. One is reminded of the famous football aphorism about attempting a forward pass: "[F]our things can happen—and three [of them] are bad." (Oates, *Woody Hayes, Ohio State Legend, Is Dead,* L.A. Times (Mar. 13, 1987) Sports, pt. 3, col. 2, p. 1.) However, we recognize that, on occasion, it will be appropriate to inform the jury that unanimity is not required. In such a situation, we believe the following language would be appropriate: "The defendant is accused of having violated Penal Code section 273a, subdivision (a), child abuse, [in count ____] by having engaged in a course of conduct between [date] and [date]. The People must prove beyond a reasonable doubt that the defendant engaged in this course of conduct. Each juror must agree that defendant engaged in acts or omissions that prove the required course of conduct. As long as each of you is convinced beyond a reasonable doubt that the defendant committed some acts or omissions that prove the course of conduct, you need not all rely on the same acts or omissions to reach that conclusion."

[8]There is a split of authority on the proper standard for determining whether the erroneous failure to give a unanimity instruction is reversible. (*People v. Vargas* (2001) 91 Cal.App.4th 506, 561 [110 Cal.Rptr.2d 210].) Since we find the error harmless even under the more stringent *Chapman* test, we need not decide whether *Chapman* or *Watson* applies. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

is in cases of this nature. That is, the victim relates that a "consistent, repetitive pattern of acts occurred" and the defendant denies it. The jury either believes or disbelieves the defendant, but "there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them." (*Jones*, at pp. 321-322; accord, *People v. Riel* (2000) 22 Cal.4th 1153, 1199-1200 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *Stankewitz*, at p. 100.)

In the instant case the court erred by giving the non-unanimity instruction. We conclude that the same harmless error analysis should apply to this different error. The vice of this court's misinstruction is that it refocused the jury away from the course of conduct charged to the specific acts proved and created the reasonable possibility of a non-unanimous jury verdict. This possibility exists, however, only to the extent that it is reasonably possible that the jurors would disagree about the specific acts proved. Conversely, when, as here, such disagreement is unlikely because the true issue in the case was a single credibility dispute, the error is harmless.

As in *Jones*, this case was reduced to a single credibility dispute on each prosecution theory. The prosecution case against Mother proceeded on the theory that she had ignored her child's suffering throughout the time period charged. The case against Father rested on the same theory as well as the theory that he was responsible for directly inflicting the injuries. Though the prosecutor briefly referenced the non-unanimity instruction at the beginning of his closing argument, the balance of that argument and his rebuttal clearly reveals his focus on the defendants' course of conduct and not on individual acts or omissions.

In support of the prosecution theories, Dr. Crawford testified that the child's serious injuries resulted from major trauma inflicted in separate incidents during a relatively short time period. He testified further that the trauma was intentionally inflicted by a person, and ruled out accidental causation. Finally, the doctor explained that each of these injuries would have resulted in substantial pain. Both parents defended against the theory that they ignored the child's suffering by denying that they knew or should have known at any point during the relevant time period that the child was injured or in pain. Thus, as to this form of abuse, the jurors could either believe the doctor or the defendants on whether they knew or should have known that the child needed medical attention. As in *Jones*, there is no reasonable possibility that the jurors would disagree as to particular acts or omissions.

As to the theory that Father inflicted the injuries, Father uniformly denied causing any of them.[9] Asked to explain how the injuries might have occurred, Father mentioned at least two accidental falls, one from a bed and the second due to a bicycle collision. Father's complete denial of responsibility was directly disputed by Dr. Crawford, who eliminated accidental, nonhuman causation and specifically testified that the final injury predated the alleged bicycle accident. Again, the central dispute involved a credibility contest between the Father and the doctor. The jury was entitled to believe either one, but there is no reasonable possibility that the jurors partially believed each and disagreed on the infliction of particular substantial injuries. Thus, we conclude that the trial court's error in giving the non-unanimity instruction was harmless.

B.-D.*

. . . . . . . . . . . . . . . . . . . . .

II.-IX.*

. . . . . . . . . . . . . . . . . . . . .

CONCLUSION

The judgment entered as to each defendant is affirmed.

Stevens, Acting P. J., and Gemello, J., concurred.

A petition for a rehearing was denied January 3, 2003, and appellants' petition for review by the Supreme Court was denied February 25, 2003.

---

[9]The only injury Father did not attribute to an accident beyond his control was the bite mark on the child's cheek. However, in closing argument, both Father's counsel and the prosecutor agreed that that injury would not constitute a felony eliminating any reasonable possibility that some jurors relied on that act to convict.

*See footnote, *ante*, page 108.