Filed 10/14/14  P. v. Titus CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058156 |
| v. | (Super.Ct.No. SICRF1152893) |
| MARVIN DOUGLAS TITUS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Inyo County.  Burt Pines, Judge.  (Retired judge of the Los Angeles Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed.

Wallin & Klarich and Stephen D. Klarich for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I

## INTRODUCTION[1]

Defendant Marvin Douglas Titus was originally charged with 11 sexual crimes involving three girls. A jury convicted defendant of eight counts of child molestation: counts 2, 6, and 11, forcible lewd conduct (§ 288, subd. (b)(1)); counts 3 and 8, misdemeanor sexual battery (§ 243.4, subd. (e)(1)); counts 4 and 9, misdemeanor child annoyance (§ 647.6, subd. (a)(1)); and count 7, continuous child sexual abuse. (§ 288.5.) The jury also found true that counts 2, 6, 7, and 11 were committed against two or more victims. (§ 667.61, subd. (e)(4).) The jury did not convict defendant on counts 1, 5, and 10 for violations of section 288, subdivision (a).

The court dismissed counts 1, 5, 6, and 10 as duplicative. The court sentenced defendant to two consecutive indeterminate sentences of 15 years to life.

On appeal, defendant contends he was denied due process during plea negotiations; that the court failed to give a unanimity instruction and improperly gave CALCRIM Nos. 1110, 1111, and 1120; and the jury received a copy of the criminal information which contained prejudicial information. We reject these contentions and affirm the judgment.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

II

FACTUAL AND PROCEDURAL BACKGROUND

The charges against defendant involved his conduct between 2002 and 2006 with C.M., the daughter of one girlfriend, and his conduct between 2008 and 2011 with K.A., the daughter of another girlfriend, and K.A.'s playmate, K.G. The conduct with K.A. and K.G. occurred one day in August or September 2011 while defendant drove the two girls around in his truck looking for a lost dog.

A. *C.M.* (*Count 11*)

C.S. dated defendant and lived with him in Big Pine between 2001 or 2002 and 2006, together with her daughter, C.M., born in 1990. C.M. became uncomfortable when defendant began to make inappropriate jokes and comments about C.M.'s breasts and oral copulation. Defendant told C.M. he was masturbating while watching her from cameras he had placed in her bedroom and shower although she could not find any cameras. Defendant would not quit slapping C.M. and her friends on their buttocks even though they asked him to stop.

One night in 2002 or 2003, when C.M. was 12 years old, defendant crawled into bed with her while she pretended to sleep. He unsnapped her bra and touched her breasts. He asked to suck on her breasts and if she would touch his penis. C.M. left saying she had to use the bathroom. When C.M. was in the eighth grade—2003 or 2004—defendant offered to buy her new school clothes if she lifted her shirt to show him her breasts.

C.M. told a friend, Sarah, about defendant touching her breasts. C.M. cried and

3

asked Sarah not to tell anyone. Sarah said defendant had not misbehaved with her.

C.S testified she had heard defendant use vulgar sexual terms around C.M. C.S. had seen defendant tickle her daughter on his lap and slap her friends' buttocks. Early one morning in 2005, C.S. found defendant sleeping in a bunk bed with C.M. C.M. woke up when her mother began screaming. After this incident, C.S. and C.M. talked to an Inyo deputy sheriff but they did not discuss other inappropriate conduct by defendant.

C.M. made a "pretext" telephone call to defendant. Defendant claimed he did not remember making comments about oral copulation or spying on C.M. with cameras but he contended he was not serious. Defendant told C.M to forget it all as "crap." He admitted C.S. had confronted him about looking at and touching C.M.'s breasts.

B. K.G. (*Counts 2, 3, and 4*) *and K.A.* (*Counts 7, 8, and 9*)

Between 2008 and 2011, defendant lived with his girlfriend, S.K., and her daughter, K.A., born in 2002. K.A.'s friend K.G., born in 2002, often played at their house.

One day in August or September 2011, when defendant drove the two girls in his truck, looking for a lost dog, defendant touched K.G. on her thigh. She testified she told him to stop and pulled away. He responded by tugging on her shirt while still touching her thigh and not stopping until she hit him. In a recorded interview, K.G. said defendant had touched her in three places, her shirt, leg, and crotch. Although she told her parents defendant had "tickled" her, she had misspoken. She often spent the weekend at K.A.'s house and defendant would "scare" or "spank" her although she told him to stop.

4

On September 3, 2011, K.G. told her parents she did not want to visit K.A.'s house because of defendant. K.A. told K.G.'s mother that defendant "constantly touche[d] her privates." K.A. also told K.G.'s father that she had told her own mother about defendant touching her. K.G.'s stepmother testified that K.A. seemed shocked by K.G.'s accusations against defendant. Another adult spoke to K.A. about defendant touching her "private parts" and reported the conversation to law enforcement.

K.G.'s parents immediately confronted defendant who denied touching K.G. inappropriately although he admitted touching her in the truck. Defendant also admitted an earlier incident when he touched a girl's breast in his sleep (referring to C.M.). When S.K. came to pick up K.A., she was angry and yelling at her daughter.

K.A. testified that, during the search for the dog, she sat on defendant's lap and K.G. sat in the passenger's seat of the truck. Defendant "tickled" K.G.'s knee and K.A. thought he was just "messing around." K.A. was taking medication that may have affected her memory. K.A. did not remember defendant ever touching her inappropriately or telling anyone he had. K.A. liked defendant and had lived with him for a long time.

In an earlier recorded interview, K.A. had stated she did not like defendant because he had touched her and K.G. in "bad spots" between the legs and the touching occurred in the second, third, and fourth grades. During the truck ride, defendant touched

both girls and he was too strong for them to resist.

An Inyo County Deputy Sheriff, Christopher Walston, gave defendant a *Miranda*[2] advisement and interviewed him. Defendant denied any inappropriate touching. He claimed he had let K.A. steer the truck and he had tickled K.G. playfully until she asked him to stop.

Holly DeVincent, a social worker, interviewed K.A.[3] K.A. said that defendant had touched K.G.'s genitals and K.A. tried to move his hand but he was too strong. Defendant also touched K.A.'s legs. Another time he had touched her genitals both over and under her clothes while they were sitting on a living room couch.

S.K., testified that K.A. habitually masturbated frequently enough to cause dry skin and requiring cream. After they searched for the lost dog, defendant and the two girls were laughing when they returned and asked for ice cream. S.K. believed defendant and did not trust law enforcement. Defendant's son testified that defendant told him about K.A. masturbating. Defendant would lead her into her room and tell her to "rub herself raw."

*C. Defense Evidence*

Defendant's daughter testified defendant did not behave inappropriately with

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

[3] Throughout her testimony, DeVincent incorrectly uses the term, "vagina," which is an internal organ, to describe female external genitalia. In this opinion, we will use the terms "genitals" in place of "vagina."

6

young girls and C.M. was not visibly uncomfortable with him.  Defendant's daughter's friends testified he did not speak or act inappropriately.  Another woman testified she knew defendant and had lived with him and he never misbehaved with children.

Defendant denied he ever touched C.M.'s breasts or otherwise touched her sexually.  They played a slapping game until she did not want to anymore.  Twice he lay on her bed on top of the covers to talk to her and comfort her before she fell asleep.  Defendant denied making comments about oral copulation, bedroom cameras, or offers of school clothes in exchange for looking at C.M.'s breasts.  He broke up with her mother because of lies and deceit.

Defendant played with K.A. by pretending to spank her over his knee.  He never touched K.A. or K.G. sexually.  One time only, he applied cream on K.A. after she had masturbated until she was raw.  He disciplined her for masturbating publicly and told her she should stay in her bedroom.

Defendant testified that he let K.A. sit in front of him and steer the truck while K.G. sat in the back.  He touched K.G.'s knee to get her attention when he asked a question about the lost dog.  K.A. accidentally stepped on his crotch and he warned her to be careful of his "pee-pee."  The girls laughed and played a game—"Get Marvin" — involving tickling.  K.G. said to watch out for her "boobs."  Defendant said she had none

7

and tugged on her turtleneck shirt.[4] The tickling was "just playing" and only lasted for a minute until K.A. asked it to stop.

## III

## PLEA NEGOTIOATIONS

During pretrial settlement negotiations, the court asked the prosecutor to explain "what is the maximum the defendant could serve if he's convicted on all counts if all the allegations are found to be true." The prosecutor responded, "if he's convicted of all counts, all counts and all allegations . . . he would be subject to the term of life imprisonment." The court then asked, "With what minimum period?" The prosecutor said it would be imprisonment of 15 years to life. The prosecutor then indicated he was willing to accept a plea that did not involve life imprisonment, specifically a maximum term of 16 years with good conduct credit. After defendant was convicted, the court imposed a final sentence of two consecutive sentences of 15 years to life, a total of 30 years to life. There were no objections to the final sentence.

Defendant argues his constitutional rights—due process rights under the Fourteenth Amendment and the right to effective assistance of counsel under the Sixth Amendment—were violated because he was not correctly advised that the possible maximum sentence was greater than 15 years to life. He contends, had he been correctly informed, he would have accepted a plea bargain rather than risk trial. We conclude

---

[4] There was rebuttal evidence that K.G. never wore turtlenecks.

defendant was not advised wrongly and there is no evidence that defendant would have accepted a plea bargain.

As the record demonstrates, the prosecutor did not say defendant's maximum sentence was 15 years to life. Rather that term was described as the minimum sentence. The prosecutor was correct that, if defendant was convicted as charged of sex offenses against more than one victim, he was subject to a mandatory life sentence with a minimum term of at least 15 years. (§ 667.61, subd. (b); *People v. Wutzke* (2002) 28 Cal.4th 923, 930.) Notably, the prosecutor did not say defendant was subject to a single term of life imprisonment. The factual predicate of defendant's argument—that he was misadvised—simply does not exist. Therefore, he cannot claim a due process violation or ineffective assistance of counsel.

Notwithstanding the foregoing, defendant also cannot point to any evidence in the record that he would have pleaded guilty in exchange for a lesser sentence. (*People v. Miralrio* (2008) 147 Cal.App.4th 448, 459-463, [disagreeing that the People have the burden of proving the error was harmless beyond a reasonable doubt and rejecting *People v. Goodwillie* (2007) 167 Cal.App.4th 695].) "In determining whether a defendant, with effective assistance, would have accepted the offer, pertinent factors to be considered include: whether counsel actually and accurately communicated the offer to the defendant; the advice, if any, given by counsel; the disparity between the terms of the proposed plea bargain and the probable consequences of proceeding to trial, as viewed at the time of the offer; and whether the defendant indicated he or she was amenable to

9

negotiating a plea bargain. In this context, a defendant's self-serving statement—after trial, conviction, and sentence—that with competent advice he or she *would* have accepted a proffered plea bargain, is insufficient in and of itself to sustain the defendant's burden of proof as to prejudice, and must be corroborated independently by objective evidence. A contrary holding would lead to an unchecked flow of easily fabricated claims." (*In re Alvernaz* (1992) 2 Cal.4th 924, 938.)

Here defendant steadfastly maintained his innocence in his testimony at trial and in the 54-page letter he wrote to the court before sentencing. Defendant rejected the offer to plead guilty to a single count of section 288.5 and a sentence of 16 years with good time credit. His belated claim that he would have accepted a plea if he had not been wrongly advised is wholly uncorroborated independently by any objective evidence. Defendant has not met his burden of proof to show prejudice. (*In re Alvernaz, supra,* 2 Cal.4th at p. 938.)

IV

INSTRUCTIONAL ERROR

*A. Unanimity Instruction*

The court gave the jury a unanimity instruction, CALCRIM No. 3500 on counts 5, 6, 8, and 9 involving K.A. The court did not give a unanimity instruction on the four counts (1-4) involving K.G. and the two counts (10 and 11) involving C.M. The court instructed the jury with CALCRIM No. 3515: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict

10

for each one." The court also instructed the jury based on CALCRIM No. 3550: "Your verdict on each count and any special findings must be unanimous. This means that, to return a verdict, all of you must agree to it."

Defendant contends the court erred by not giving CALCRIM No. 3500 on the counts involving K.G. and C.M. because there was evidence of multiple acts of abuse. In particular, defendant molested K.G. in the truck and also spanked her at K.A.'s home. Defendant touched C.M.'s breast in bed; additionally, he slapped her on the buttocks and tickled her on his lap.

We conduct an independent review of instructional error. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) In *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1588-1589, this court said: "A criminal defendant is entitled to a verdict in which all 12 jurors concur as a matter of due process under the state and federal Constitutions. [Citation.] In any case in which the evidence would permit jurors to find the defendant guilty of a crime based on two or more discrete acts, either the prosecutor must elect among the alternatives or the court must require the jury to agree on the same criminal act. [Citation.] Where it is warranted, the court must give the instruction sua sponte. [Citation.] The omission of a unanimity instruction is reversible error if, without it, some jurors may have believed the defendant guilty based on one act, while others may have believed him guilty based on another. [Citation.]"

In this case, the jury was properly instructed with CALCRIM Nos. 3515 and 3550 on the need for unanimity on all counts. The prosecutor clearly elected the acts on which

11

the charges were based. With regard to K.G., the prosecutor focused the questioning and argument entirely on the incidents in the truck, not the collateral evidence about spanking. With regard to C.M., count 11 was clearly based solely on defendant touching her breast in bed, not on him slapping her buttocks. The jurors could not have disagreed about the acts defendants committed based on the evidence at trial. (*People v. Napoles* (2002) 104 Cal.App.4th 108, 120; *People v. Matute* (2002) 103 Cal.App.4th 1437, 1449-1450.)

Any error in not giving CALCRIM No. 3500 on the charges involving K.G. and C.M. was harmless based on any standard. (*People v. Napoles, supra,* 104 Cal.App.4th at p. 119 and fn. 8.) The other instructions given by the trial court—CALCRIM Nos. 3515 and 3550—cured any deficiency caused by not giving CALCRIM No. 3500. (*People v. Howard* (1992) 1 Cal.4th 1132, 1172; *People v. Wolfe* (2003) 114 Cal.App.4th 177, 187; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.) Again, there was no reasonable likelihood of juror disagreement about the acts defendant committed. (*Napoles,* at p. 120.) It is also undeniable that the jury must have decided defendant's protestations of innocence were not credible. (*People v. Jones* (1990) 51 Cal.3d 294, 332.)

B. *CALCRIM Nos. 1110, 1111, and 1120*

The court used the standard jury instructions regarding lewd or lascivious act of a child under 14 years (CALCRIM No. 1110); force or fear (CALCRIM No. 1111); and continuous sexual abuse (CALCRIM No. 1120). Defendant contends the instructions are

confusing because of they use language negating the element of section 288 that defendant touch with a sexual intent.

Defendant forfeited this claim by not asserting it below. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) In any event, we disagree on the merits. Actual arousal of defendant's lust, passion, or desire was not an element of defendant's offenses. (*People v. Bronson* (1924) 69 Cal.App. 83, 86; *People v. McCurdy* (1923) 60 Cal.App. 499, 502-503.) Section 288 only requires there be a sexual intent—not that the intended result actually be accomplished. The three instructions comport with the applicable law.

V

THE CRIMINAL INFORMATION

Defendant lastly objects to the jury receiving a copy of the criminal information that states defendant would be subject to registration as a sex offender and to an AIDS test, that refers to a "Suspected Child Abuse Report," and that describes the charges as serious and violent. That argument fails because the jury received a redacted copy of the criminal information that omits the material defendant has identified as prejudicial.

13

## VI

## DISPOSITION

No error occurred during the plea negotiations and the court properly instructed the jury. We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

RAMIREZ

P. J.

McKINSTER

J.