Filed 1/22/14  P. v. Guzman CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B242359 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA385965) |
| v. | |
| DENNIS GUZMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail Ruderman Feuer, Judge.  Affirmed.

Mark S. Devore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels, Steven E. Mercer and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Dennis Guzman appeals the judgment following a jury trial in which he was found guilty of two counts of assault with a semiautomatic firearm, with findings of a personal use of a firearm (Pen. Code, §§ 245, subd. (b), 12022.5, subd. (a); counts 3 and 4),[1] and of one count of unlawfully carrying a loaded firearm (§ 12031, subd. a)(1); count 5).[2]

At sentencing, the trial court selected count 4, assault with a semiautomatic firearm, as the base term. It imposed the middle term of six years, enhanced by an upper term of 10 years for the firearm use enhancement, a total of 16 years in state prison. It then imposed concurrent terms of 16 years for the count 3 assault with a semiautomatic firearm, enhanced with a 10-year upper term for the firearm use, and of two years for count 5, carrying a loaded firearm, the latter of which was stayed pursuant to section 654.

## CONTENTIONS

Guzman (appellant) contends: (1) the evidence is insufficient to support his convictions of assault with a semiautomatic firearm in counts 3 and 4 as he had no "present ability to inflict injury"; (2) the trial court erred by failing sua sponte to instruct the jury with a unanimity instruction, CALCRIM No. 3500; and (3) there was *Cunningham* error (*Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*)) as he was denied a jury trial on aggravating factors used to impose the firearm use enhancements, or trial counsel rendered ineffective assistance of trial counsel as counsel failed to demand a jury trial on aggravating factors.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    The jury acquitted appellant of two counts of attempted second degree murder (§§ 664, 187, subd. (a)) and of one count of assault with a semiautomatic firearm. (§ 245, subd. (b).)

2

# BACKGROUND

1. *The prosecution's case-in-chief.*

    a. *The assaults.*

Xochitl Rivas (Rivas) was a volunteer drug and alcohol counselor at an alcohol and drug rehabilitation center, "La Decision Es Tuya," which translated into English meant, "The Decision Is Yours." At 4:00 p.m. on June 26, 2011, she was driving to work with her eight-year-old daughter, Nayemma. Several minutes away from work, Rivas saw appellant lying on the sidewalk. It was a hot day, and appellant had ants crawling on his face. Appellant looked and smelled as if he was drunk.

Rivas spoke to appellant in Spanish and invited him to go with her to the rehabilitation center.[3] He appeared to be a bit indecisive and disoriented but got into her car, and she drove him there. They conversed as they drove. When they arrived, appellant got out of the car and stood looking at the center's sign, " 'Alcoholics Anonymous. The Decision Is Yours.' " His face took on an expression of surprise. He said, " 'No, No, I don't want this.' " Rivas explained that his participation was voluntary.

Chavez, a worker at the center, walked out the center's locked front door to meet Rivas and relocked the door. Rivas turned to Chavez and told him appellant was apparently reluctant. Chavez said, "It's for his own good." Appellant looked angry. Rivas repeated, " 'If you don't want to come in, don't go in. It's your decision.' "

Appellant backed up four steps, took out a handgun, raised it over his head and used his other hand to move something atop the gun. He pointed the gun at Chavez and pulled the trigger. The gun clicked and failed to discharge. Chavez ran inside and locked the door. Appellant lowered the gun and raised it again, moved something atop the gun, then pointed it at Nayemma. Rivas said, " 'Please don't shoot at my

---

[3]    At trial, Rivas testified in Spanish with the assistance of a Spanish-to-English interpreter. During the events leading up to the shooting and during the shooting, Rivas, Jesus Chavez (Chavez) and appellant spoke Spanish.

daughter,' " and pushed Nayemma behind her. Appellant pulled the trigger while pointing the weapon at Nayemma. Rivas heard a click, and again the gun failed to discharge.

Appellant raised the gun a third time, made the same motion atop the gun and pointed it at Rivas. He attempted to discharge the gun again, but it did not fire. Then appellant tripped and fell backwards.

Chavez let Nayemma into the building and relocked the door. Rivas hesitated but went over and stomped on appellant's hand. Appellant let go of the gun, and Rivas took it and entered the locked rehabilitation center.

Appellant paced outside the rehabilitation center demanding the return of his gun. The police arrived and found appellant walking a short distance away. Rivas identified him as her assailant. When the officers contacted appellant, he appeared intoxicated and was combative. Appellant had 23 live rounds of ammunition for the handgun in a pants pocket.

b. *Officer Medina's and the firearm expert's testimony.*

Los Angeles Police Officer Gabriel Medina (Officer Medina) testified that at the assault scene, he took the handgun from Officer Twycross, who was speaking to Rivas. He unloaded it. There were five bullets in its magazine and chamber, and the handgun was ready to be fired. However, the five bullets in the chamber and magazine were loaded into the chamber and magazine backwards. The bullet in the chamber was not "fully seated," and the slide was not completely closed.

Officer Medina explained to the jury how the handgun operated by loading two dummy rounds backwards into appellant's gun. The dummy rounds fed from the magazine into the chamber. However, the dummy rounds were a different size than the bullets in appellant's magazine, and they currently were not causing a jam. The dummy rounds did block the slide from moving completely, which prevents that gun, if it is operating as originally designed by the manufacturer, from firing. In the backwards-loaded condition the firearm was in when the officers recovered the weapon, the assailant could pull the trigger, but the hammer initially would not drop. When the

4

dummy rounds were fed into the chambers backward, it prevented the slide from closing completely, and the gun jammed. However, the officer was able to manipulate the handgun until the dummy bullet compressed. At that point, the slide closed a little more, and the hammer was able to drop.

Officer Paul Choung, a firearms expert, testified that the recovered handgun was a Browning BDA-380 semiautomatic firearm. The handgun was "fully functional." He explained once the magazine is in the gun, you can "rack" the slide back and when the slide moves forward, a bullet is chambered. In this position, the gun is cocked, the operator can pull the trigger, and the gun will discharge. To fire the first round from appellant's firearm, you have to "rack" the slide, or pull it toward you. After the first round, the gun automatically feeds the next bullet in the magazine into the chamber. If the gun jams, you will have to move the slide backwards and forwards manually. If the slide is not all the way forward, you would not be able to pull the trigger or to hear the "main click" of the hammer dropping. Once you initiate firing by pulling back on the slide, you can pull the trigger and discharge the firearm twice before it again locks in its open position.

When appellant's firearm was working properly, one cannot discharge a bullet from the chamber unless the magazine is inserted. Appellant's firearm, however, was fully functional without the magazine. If the gun jammed or malfunctioned, one can correct the malfunction by moving the slide back and forth to eject the bullet and remove any obstruction in the chamber. Then the handgun can be reloaded from the magazine by pulling back the slide and chambering a bullet.

2. *The defense.*

Anthony Paul, a former Philadelphia police officer and firearms expert, testified that he used live ammunition, not a dummy round, to test appellant's handgun. When live ammunition was loaded in the magazine backwards, the bullets did not enter the chamber; the bullet was forced down into the magazine well. The click heard when the trigger is pulled is not the hammer falling. The improperly-fed cartridge holds the slide to the rear in a position that does not permit the disconnector to engage. With the

5

backwards feed, the firing pin did not strike the bullet three out of three times he pulled the trigger attemping to discharge the handgun. He opined that the click Rivas heard when appellant pulled the trigger was the slide "running home" on the improperly-fed cartridge. He concluded that the handgun would not discharge a round when live rounds were improperly loaded into the magazine.

During cross-examination, Paul explained that in his 50 years of experience, he had never seen this particular firearm discharge when the bullets were fed into the magazine and chamber backwards. He asserted, "I can't say it's not going to happen, but I can say I never experienced it." He said that a dummy round, which lacked any explosive filler, fed into the chamber backwards could enter a chamber when the slide was maneuvered, compressing the round. When the prosecutor asked the expert to use live ammunition to demonstrate his experiment with the gun, Paul refused. He said there is a remote possibility that even the live ammunition could compress, and the explosives in a bullet are very sensitive. If the firing pin hit the wrong end of the bullet, it is possible the bullet would explode and matter would be discharged out the handgun's barrel at great velocity.

Paul admitted that if the handgun jammed due to improper feed, the cartridge can be removed quite quickly by pushing the slide and simultaneously hitting the magazine release button, ejecting the improperly seated round in the chamber. At that point, the gun can be discharged immediately by manually reinserting a round into the chamber. It is awkward to load the handgun this way, but it can be done.

## DISCUSSION

1. *Sufficiency of the evidence.*

   a. *The standard of review.*

Recently, in *People v. Whisenhunt* (2008) 44 Cal.4th 174 (*Whisenhunt*), the California Supreme Court summarized the well-established standard of review.

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—

6

evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]' [Citation.]" (*Whisenhunt*, *supra*, 44 Cal.4th at p. 200.)

" ' "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by the [trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]". . . .' [Citation.]" (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304, 306.)

The uncorroborated testimony of a single witness is sufficient to sustain a conviction unless it is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Indeed, " '[t]he testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent

or false as to other portions.  [Citations.]' " (*In re Robert V.* (1982) 132 Cal.App.3d 815, 821.)[4]

       b. *The other relevant legal principles.*

The elements of an assault with a semiautomatic firearm are as follows: (1) The defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant did the act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (4) when the defendant acted, he had the present ability to apply force with a semiautomatic weapon.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 507 (*Hartsch*); *People v. Williams* (2001) 26 Cal.4th 779, 784-788 (*Williams*).)

An assault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur; it requires only an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another. (*Williams, supra*, 26 Cal.4th at p. 790.)  Pointing a gun at someone in a menacing manner is sufficient to establish the requisite mental state.  (*Hartsch, supra*, 49 Cal.4th at p. 507.)

"[W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required [for an assault] if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury."  (*People v. Chance* (2008) 44 Cal.4th 1164, 1172 (*Chance*).)  The defendant must have an actual, not merely apparent, ability to inflict injury.  "Present ability" is negated only where the

---

[4]    Appellant raised the sufficiency of the evidence in the trial court on the same ground in his section 1118.1 motion and motion for a new trial.  The motions were denied.

circumstances of the injury turn out to be impossible for reasons unrelated to the defendant's preparations. (*Ibid.*) A defendant has committed an assault where he has actually launched his attack but failed because of some unforeseen circumstance which made success impossible. (*Id.* at p. 1174.)

c. *The analysis.*

In *People v. Ranson* (1974) 40 Cal.App.3d 317 (*Ranson*), the defendant pointed a .22-caliber rifle at an officer. The rifle held by the *Ranson* defendant was definitely loaded and operable; however, the top cartridge that was to be fired was fed into the chamber at an angle causing the rifle to jam. There was trial evidence from which the trier of fact could infer appellant knew how to take off and rapidly reinsert the clip. (*Id.* at pp. 319-320.) On appeal, the defendant argued the jammed condition of the rifle negated any present ability to inflict injury.

The *Ranson* court rejected the argument. It held the evidence of present ability was sufficient, even though the defendant had to do much more than turn around to use his weapon against the officer. He had to remove the clip, dislodge the jammed cartridge, reinsert the clip, chamber a round, point the weapon and pull the trigger. (*Ranson, supra,* 40 Cal.App.3d at p. 321.)

Following *Ranson*, the California Supreme Court decided another similar case, *Chance, supra*, 44 Cal.4th 1164. At page 1172 of *Chance*, the court cited *Ranson* with approval. It explained the "present ability" element of assault is satisfied when a defendant has attained the means and location to strike immediately. In the context of "present ability," "immediately" does not mean instantaneously. It simply means the defendant must have the ability to inflict injury on the present occasion. An assault occurs even if the defendant is several steps away from inflicting injury, or if the victim is in a protected position so that the injury would not be immediate in the strictest sense of that term. (*Chance,* at p. 1171.)

In *Chance*, the court found an assault had occurred during an armed confrontation with a police officer. After the confrontation, the officers discovered appellant's gun had a fully loaded magazine. There was no round in the firing chamber,

but the defendant only had to pull back a slide mechanism in order to chamber a round and fire. The gun's safety was off. (*Chance, supra*, 44 Cal.4th at p. 1169.)

In this instance, appellant contends that the evidence is insufficient to support the jury verdicts for assault with a semiautomatic firearm. He argues the evidence is insufficient to support these verdicts as the record discloses appellant "need[ed] to perform additional acts such as correctly reloading the weapon before he could actually be in position to apply force to the victims," and accordingly, he failed to have the "present ability" to commit the assault. He urges the expert testimony amounted to evidence there was only the remotest of possibilities the firearm could be discharged with the backward feed.

We find no merit in his contention. Appellant was only slightly removed from being immediately able to fire his weapon. His firearm was fully functional. He attempted to shoot the victims by pointing the handgun at them and pulling the handgun's trigger. The handgun jammed and would not fire as the slide could not close over an improperly-fed round in the chamber, which in turn prevented the hammer from falling and the firing pin from striking the butt of the round. This conduct was near enough to completion to constitute the "present ability" needed for an assault. According to the defense's own firearms expert, it would have taken appellant seconds to remove the jam from the weapon and reload the firearm manually with an ejected bullet or one in his pocket.

It is irrelevant to our substantial evidence analysis that appellant did not do so as he was so intoxicated it did not occur to him to quickly eject and rechamber the bullet so he could discharge his handgun. Appellant was sufficiently "along the continuum of conduct toward battery" to hold him criminally liable for his conduct. (*Chance, supra*, 44 Cal.4th at p. 1173.) All he needed to do was push a button, releasing the magazine, and clear the jam. The incorrectly-inserted round would fall out, and appellant could manually reload a new round into his gun's chamber in a fully-seated position.

Also, the defense expert could not be absolutely certain appellant's manipulation of the slide might not compress and then push the backwards-fed bullet into the chamber, making it possible to discharge the live round from the chamber; i.e., there was no unequivocal evidence that discharging the round from appellant's firearm was impossible.  (*People v Valdez* (1985) 175 Cal.App.3d 103, 109-110 [distinguishing the assault in *Valdez* from cases where it was established it would have been impossible to inflict injury].)

Furthermore, a jury is not permitted to consider appellant's intoxication in determining whether he committed felonious assault.  (*People v. Rocha* (1971) 3 Cal.3d 893, 898; see *Williams, supra,* 26 Cal.4th at pp. 785-790 [voluntary intoxication does not justify an assault as assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another].)

2. *Jury instruction on unanimity.*

Appellant contends that certain comments by the prosecutor during closing argument concerning bludgeoning the victims presented an alternative theory of guilt that required a sua sponte unanimity jury instruction, such as CALCRIM No. 3500.

During his closing argument, the prosecutor argued, in pertinent part, as follows.

"And the only question is when he's pointing the gun at Nayemma and her mother, what is the intent? . . . [¶]  He did that on purpose.  He pointed the gun. He pulled it out for a reason.  He was angry when he realized where he was.  His attitude significantly changed, and he became angry at [Chavez], but really, particularly, his anger was focused on Ms. Rivas, and so when he pulled out the gun and pointed it at her, he did that on purpose.  That wasn't an accident.  [¶]  And he knew and a reasonable person like you or I would realize that that's the sort of act that could result in force. *He's five feet away.  If he wanted to, he could have taken the gun and swung it at them, and that would be an assault because this gun can be used not just to fire, but to hit a person, but he didn't just have that ability.*  [¶]  He had the ability to do what he then proceeded to do which was move the slide back to bring one round from the magazine

11

into the chamber, and that moment when he's trying to take that step of pulling the trigger, there is an ability to shoot.  [¶] . . . [¶]  He had the ability to do what he then proceeded to do which was move the slide back to bring one round from the magazine into the chamber, and that moment when he's trying to take that step of pulling the trigger, there is an ability to shoot."  (Italics added.)

This contention also lacks merit.

"In a criminal case, a defendant has the constitutional right to a unanimous jury verdict.  (Cal. Const., art. I, § 16; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)  Furthermore, 'the jury must agree unanimously the defendant is guilty of a *specific* crime.'  (*Russo*, at p. 1132.)  'Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.] [¶] This requirement of unanimity as to the criminal act "is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed." '  (*Ibid.*)"  (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1374-1375.)

The complained of comments were not an argument the one charge of assault per victim was committed by two discrete criminal acts; i.e., appellant swung his gun at each victim, then pointed the gun at the victim and attempted to shoot her.  The prosecutor did not present the bludgeoning comment as one of two alternate theories on how the criminal acts of assault occurred on Nayemma and Rivas.  His bludgeoning comment was an aside mentioning appellant could also be guilty of assault if he had tried to swing with the gun at the victims, attempting to use the gun as a bludgeon. But the prosecutor clarified before continuing with his argument that no bludgeoning occurred here.

In any event, "unanimity as to exactly how the crime was committed is not required.  Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.'

12

[Citation.]" (*Russo, supra*, 25 Cal.4th at p. 1135; *Ortiz, supra*, 208 Cal.App.4th at p. 1375.) "It is settled that as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of [a crime] as that offense is defined by statute, it need not decide unanimously by which theory he is guilty." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918.)

The trial court had no sua sponte duty to instruct on unanimity.

Further, even if this court found the prosecutor's remarks to be ambiguous, no reversal is required. The jury would not have been confused by the prosecutor's argument and disagreed as to the actual criminal acts appellant had committed. There were two charges here, and two criminal acts, one directed individually at each of two victims. "The erroneous failure to give a unanimity instruction is harmless [beyond a reasonable doubt] if disagreement among the jurors concerning the different specific acts proved is not reasonably possible." (*People v. Napoles* (2002) 104 Cal.App.4th 108, 119 & fn. 8.)

3. Cunningham *error.*

a. *The right to a jury trial.*

At sentencing on June 28, 2012, the trial court imposed upper terms of 10 years each for the two firearm use enhancements.

Asserting the trial court imposed the upper term based on facts not submitted to the jury, appellant contends the trial court violated his constitutional right to have a jury find every fact used to impose punishment. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 470 (*Apprendi*); *Cunningham v. California* (2007) 549 U.S. 270, 274-275.)

Effective January 1, 2010, section 1170.1, subdivision (d), was amended to remove the presumption of the middle term for enhancements. (Stats. 2009, ch. 171, § 5.) The statute now states in relevant part, "If an enhancement is punishable by one of three terms, the court shall, in its discretion, impose the term that best serves the interest of justice, and state the reasons for its sentence choice on the record at the time of sentencing." (§ 1170.1, subd. (d).)

13

The amendment to subdivision (d) of section 1170.1 was a response to the decisions in *Apprendi* and *Cunningham* and essentially eliminated the middle term as the statutory maximum absent aggravating factors. This new legislation makes the upper term the statutory maximum. Trial courts now have the discretion to select among the lower, middle, and upper terms without stating ultimate facts deemed to be aggravating or mitigating under the circumstances and without weighing aggravating and mitigating circumstances. Thus, no jury trial was required on any factors mentioned by the trial court in imposing the upper terms for the firearm use enhancements.

In appellant's case, there is no problem with retroactivity. *In People v. Sandoval,* (2007) 41 Cal.4th 825 at pages 845-857, the Supreme Court held it is constitutionally appropriate to apply the amended version of the determinate sentencing law in all sentencing proceedings conducted after the effective date of the amendments, regardless of whether the offense was committed prior to the effective date of the amendments. In any event, appellant committed his offenses on June 26, 2011, well after the January 1, 2010, effective date of the amendment. (*Id.* at p. 857; *People v. Jones* (2009) 178 Cal.App.4th 853, 866-867.) Accordingly, *Apprendi* and *Cunningham* do not apply to appellant's sentencing under the determinate sentencing law.

        b. *Ineffective trial counsel.*

Appellant makes a claim of ineffective trial counsel in the event this court finds he forfeited the above sentencing contention as his trial counsel failed to demand a jury trial on factors in aggravation of the upper term. However, the Attorney General makes no claim of a forfeiture. Furthermore, as appellant was not entitled to a jury trial on aggravating factors, trial counsel's failure to object on *Apprendi* and *Cunningham* grounds does not amount to a deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 688, 687-692; *People v. Benavides* (2005) 35 Cal.4th 69, 92-93 ["To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance [is] deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.]".)

14

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


KITCHING, J.


ALDRICH, J.