Filed 8/4/21  P. v. McBroom CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C089355 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F06) |
| v. | |
| CYNTHIA DARLYNE MCBROOM, | |
| Defendant and Appellant. | |

Defendant Cynthia Darlyne McBroom and her codefendant husband, Robert Morgan McBroom, murdered their infant son, A.[1]  Frustrated by her son's crying, defendant shook him and caused his head to strike the back of a wooden chair.  A.'s behavior changed after this impact, causing defendant to believe "something wasn't right," but she did not seek medical attention.  Two or three days later, Robert similarly

---

[1]     Hereafter, we shall refer to Robert McBroom by his first name.

1

became frustrated by A.'s crying and hit the infant's head against a wall. A. stopped crying after the impact, his body became limp shortly thereafter, and he started making "a strange cooing noise." Rather than seek medical attention, Robert "brushed it off" and went to bed. Neither parent was aware of the impact inflicted by the other parent. The next morning, defendant called 911 because A. was in respiratory distress. The child was taken to the local hospital and then transported to UC Davis Medical Center, where he died from "blunt impact head injuries."

Defendant and Robert were each convicted by jury of second degree murder (Pen. Code, §§ 187, 189, subd. (b))[2] and assault on a child causing death (§ 273ab). The trial court sentenced both to an indeterminate prison term of 25 years to life for the latter crime.[3]

This appeal involves only defendant. She contends: (1) the evidence is insufficient to support her convictions because there is no substantial evidence that her actions caused A.'s death; (2) the trial court prejudicially erred by failing to instruct the jury, sua sponte, on involuntary manslaughter; and (3) the trial court also prejudicially erred by failing to provide the jury with a unanimity instruction.

We affirm. The evidence is sufficient to support the jury's finding that defendant's conduct was a substantial factor contributing to her son's death. We also conclude the trial court did not err in failing to instruct the jury on involuntary manslaughter because there was no substantial evidence supporting a rational jury's

---

[2]    Undesignated statutory references are to the Penal Code.

[3]    A sentence of 15 years to life was also imposed for second degree murder and stayed pursuant to section 654. While the abstract of judgment correctly notes the sentence imposed for this crime was stayed, it incorrectly reflects (in boxes 6 a & b) that a sentence of 15 years to life was imposed for assault on a child causing death and a sentence of 25 years to life was imposed for second degree murder. We shall order the abstract of judgment corrected to reflect the correct sentences imposed by the trial court.

conclusion that defendant was guilty of that lesser crime, but not the greater crime of implied malice murder. Finally, assuming without deciding that a unanimity instruction should have been provided, any error was harmless.

FACTS

*The Events of December 27, 2014*

By the time defendant called 911 to summon medical aid for her infant son, he was already in critical condition. As defendant described to the emergency dispatcher, A. was "gasping for air" and "his lips keep turning blue." This phone call was made at 10:16 a.m. on December 27, 2014. Defendant had been up with A. for about three hours, but he did not seem to be fully awake and would not drink from his bottle. Eventually, defendant woke up her husband and told him their son was still not hungry. After observing A.'s seemingly semiconscious condition, Robert suggested she get in the bathtub with him to see if the water would wake him up. Defendant did so, but instead of waking up, A. stopped breathing. At this point, Robert took A., put him on a towel on the floor, and started doing infant cardiopulmonary resuscitation (CPR) while defendant called 911.

Law enforcement and emergency medical personnel arrived within minutes. Officer Eric Haynes with the Anderson Police Department was the first to arrive. Robert was outside of the apartment waving to the officer as he parked his patrol unit. Inside the apartment, Haynes found defendant kneeling next to A. on the floor. She told the officer: "He was fine last night. I put him in the bath this morning hoping it would help him breathe, but it didn't work." Haynes checked A.'s pulse to make sure he was still alive and assessed the infant's breathing. It was very slow. The officer estimated "the child would take a breath about every 15 seconds or so," during which "there would be a real fast chest rise" like he was "gasping for air."

Another police officer and a paramedic arrived a few seconds later. The paramedic immediately saw that A. was in critical condition and told the officers to pick

3

up the child and carry him to the ambulance. The other officer did so, handing A. to an emergency medical technician (EMT) in the back of the ambulance. A.'s body was limp, his face was pale, and he was not breathing, "at least [not] effectively." The EMT began administering oxygen to the child and connected him to various equipment in the back of the ambulance. The paramedic then took over A.'s medical care in the ambulance while the EMT drove to Mercy Medical Center in Redding. Defendant accompanied her son to the hospital in the ambulance. She sat in the front passenger seat during the drive and told the EMT that A. "had been acting more and more lethargic for the past couple days."

At the hospital, A. was taken directly to the computed tomography (CT) scan machine. The scan showed "a significant amount of swelling" in the child's brain. He was treated in the emergency department's main trauma room. At some point, a trauma nurse asked defendant what happened to her son. Defendant told the nurse that someone had been carrying A. and fell, "causing [his] head to be injured."

Back at the apartment, a neighbor who had seen A. being carried to the ambulance came over to find out what happened. Robert told her "the baby would not wake up." The neighbor offered to drive Robert to the hospital. Robert accepted the offer. He and defendant also had a two-year-old daughter, K. After driving Robert and K. to the hospital, the neighbor offered to watch K. until he and defendant came home. Robert accepted this offer as well.

At some point after Robert was dropped off at the hospital, Sergeant Brian Cole and Investigator Rusty Bishop with the Redding Police Department arrived in response to a call of "suspicious injuries" to an infant being treated there. Sergeant Cole asked defendant and Robert whether they would agree to discuss their son's condition at the police station. They agreed. Because their interviews provide the strongest evidence of their joint responsibility for A.'s death, we describe each in some detail below.

Before doing so, we note the severity of A.'s injuries resulted in him being transported to UC Davis Medical Center in Sacramento, where he was treated by Dr.

4

Kevin Coulter in the pediatric intensive care unit. As Dr. Coulter explained during his testimony at trial: "[A.] had clearly suffered a very, very severe head injury. The CT scan had shown a significant amount of swelling. The -- he was not awake and responsive. He did not have some very basic reflexes that we would expect him to have." The doctor also explained that a magnetic resonance imaging (MRI) scan showed a "significant amount of injury to the skull, a very severe injury to brain tissue . . . essentially there was no blood flow to the brain." After a series of evaluations, A. was declared brain dead, life support measures were discontinued, and the child was pronounced dead.

A subsequent autopsy revealed the cause of death to be "blunt impact head injuries" that caused the infant's brain to swell and compress blood vessels necessary to supply blood to the brain. Reflection of the infant's scalp revealed contusions on both sides of the head, one larger bruise on the right temporal scalp and three smaller bruises on the left temporal scalp. These contusions evidenced multiple impact events. The impacts and associated brain swelling also caused subdural bleeding as well as bleeding between the skull bones. Additional portions of the forensic pathologist's testimony will be set forth in the discussion portion of the opinion.

*Defendant's Police Interview*

As mentioned, defendant and Robert both agreed to discuss their son's condition with police. They were transported to the Redding Police Department for this purpose while A. was still at the local hospital. Their interviews were conducted separately.

Defendant was questioned by Investigator Bishop. After describing the events of that morning, defendant noted the emergency room doctor's diagnosis of brain trauma and said: "I don't know how that would've happened." She added: "We haven't dropped him. We haven't shake - shooken him." The investigator then took defendant through the previous two days. Defendant said A. "seemed to be fine" on Christmas Day, but started "whining a lot" the following evening. She put A. to bed around 9:00 p.m.

5

that night and tried to wake him up about two hours later to feed him because his stomach felt "kinda empty" when she pushed on it. A. did not wake up, but defendant thought "he's just really tired" and let him sleep. The following morning, A. was not fully waking up and would not eat, leading to the events already described. Defendant denied knowing about anything happening during the previous two days that might have caused A.'s injuries, but volunteered that she did not "really let [Robert] hold [A.] too much," quickly adding: "Um, not because I don't trust him or anything." She then clarified that she always wanted to be in physical contact with her children because they helped her "sanity."

After a brief discussion about defendant's mental health, Investigator Bishop asked about Robert's mental health. Defendant answered, "he does sometimes have PTSD moments" from his time in the military, but she said he would let her know when he was "going through them" and she would "generally take the kids" while "he does his thing," by which she meant smoking cigarettes or playing video games to relax. Bishop asked whether Robert went through such an episode the previous day. Defendant said he had not. After discussing the events of Christmas Day, her relationship with Robert generally, and some other matters, the investigator stepped outside the interview room to confer with Sergeant Cole, who was interviewing Robert in another room.

When Investigator Bishop returned, he asked defendant whether she took a nap at any point the previous day. She initially said she did not recall taking one. Bishop then asked whether she got migraine headaches. Defendant said she suffered from severe ocular migraines but denied having one the previous day. Asked who fed A. that night, defendant said Robert did and claimed she was in the living room with him when he did so. According to defendant, Robert put their daughter to bed while defendant prepared A.'s bottle. Robert then asked to feed him, so she gave him the bottle and they sat together on the couch while Robert fed the child. Bishop then told defendant that he asked about her taking a nap and having a migraine because Robert told Sergeant Cole

6

that she took a nap while Robert was taking care of A. that night, to which defendant responded: "Well, I might've." She then said she remembered taking a nap, but "thought that was two nights ago" because her days were "scrambled." Defendant explained that after she made the bottle for A., while Robert was feeding him, she tried to get their daughter to go to sleep by lying in bed with her. Defendant fell asleep for about 30 minutes. When she woke up, Robert was rocking A. in his bassinet. According to defendant, "he was sleeping and he seemed to be fine." She denied harming the child and did not suspect Robert of having done so.

A short time later, Investigator Bishop mentioned the injuries suffered by A. "could've occurred from, you know, with shaking." It was at this point that defendant admitted: "I did shake him, not yesterday, but within the last week." As defendant explained, one or two days before Christmas, when Robert was out getting gas, A. would not stop crying. She "grabbed him" and "begged him to stop," but he continued to cry. Eventually, she shook the infant and caused his head to strike the back of a wooden chair that her daughter was sitting on. The impact "made a really loud thud" and moved the chair. A. "started really crying" after the impact with the chair and continued to cry for "five to ten minutes" while defendant, who also "broke down" crying, apologized to her son while holding him and rubbing the back of his head.

Investigator Bishop asked defendant whether she believed this impact with the chair was "probably" the reason A. was in the hospital. Defendant answered: "Probably." She explained that "he did kind of go through a small change, just mood wise," but immediately added: "But, uh, but it couldn't have - he perked back up." Asked to explain the mood change, defendant said he "refused to eat for a few hours" and "didn't want to do anything." Defendant admitted she should have sought medical attention for A. after this impact, but instead she hoped "he would be just okay." After A. stopped crying, he slept for "about an hour or two." When he woke up, he started "complaining a little bit," which was normal for him, but he did so "a little louder" than

7

usual.  A. ate a short time later, but not as much as usual, and then fell asleep again for "about six hours."  Asked whether that was normal behavior, defendant answered:  "Not really."  When A. woke up again around 9:00 p.m. "his stomach was growling," so defendant fed him, but he again did not eat as much as usual.  After that, however, A. "started laughing and smiling" and seemed relatively fine.  He fell asleep again around 10:30 p.m. and slept through the night, which was unusual, but he "ate normally" and "was acting normal" the next day, with the exception of seeming a little more tired than usual.

Finally, Investigator Bishop and defendant discussed "an argument" she had with Robert the night before A. was taken to the hospital.  Defendant admitted that she was upset that Robert was not talking to her, so she "grabbed a knife," mainly as a ploy to get his attention.  When Robert would take the knife away, she would grab another one.  Eventually, he took the knife stand away and hid it from her.  Defendant acknowledged she "was not in a - a good mental state."  She denied having any intention of harming herself with the knives and explained:  "I was just after attention.  And my mom raised me.  Pretty much any attention is good attention."

### Robert's Police Interview

As previously mentioned, Robert was separately interviewed by Sergeant Cole.  Robert initially claimed that after he fed and burped A. the previous night, the child "went limp."  Robert thought "he must [have] really passed out," wrapped him in a blanket, and laid him down to sleep.  Defendant was taking a nap when Robert fed A. because she had a migraine headache, but according to Robert, their two-year-old daughter K. was awake and watching a cartoon in the living room.  For the next hour, A. made a "cooing noise" in his sleep, but Robert and defendant, who had apparently woken up from her nap, "didn't think anything of it" and went to bed.  Robert slept in the next morning until defendant woke him up because A. was not fully waking up or taking his bottle.  We have already recounted the events that followed.

8

Later in the interview, Sergeant Cole asked whether A. was accidentally dropped or hit his head on anything. Robert answered: "Not that I know of. Um, there was one point I did set him on the couch though, when I was making the bottle." He then said: "My two-year[-old] daughter [K.] was around him." A short time later, Robert said "she's actually grabbed one of her toys and hit him in the head before." Cole asked Robert whether he would have heard A. cry if K. had hit him in the head with a toy. Robert said he was running water in the kitchen, and A. did not cry very loud, so perhaps not. Robert also claimed he saw a tear in A.'s eye when he returned with the bottle, but he was not "yelling, crying." A short time later, Robert mentioned K. "got into the habit of hitting" when they lived with his mother. When Cole asked Robert what he thought happened to his son, he again suggested K. might have hit A. with a toy.

After some follow-up questioning, Sergeant Cole left the interview room to speak with Investigator Bishop. Alone in the room, Robert said: "I'm gonna be going to jail." When Cole returned, they discussed some inconsistencies between Robert's account of the previous night and that provided by defendant. Cole then asked Robert whether he thought defendant "could ever hurt [A.]" Robert answered, "I'm not too sure," and added: "But at the hospital, she was saying 'Why is God punishing me?' So, right there, that made me feel like she was guilty about something." However, he also said he had never seen her hit their children, adding: "And usually, she's really - really gentle with [A.]"

At this point in the interview, Sergeant Cole explained that the nature of A.'s brain injury indicated he suffered an impact to the head that was more significant than would have been caused by a two-year-old hitting him with a toy. Cole then said he and Robert had "a good connection" because they were both "military guy[s]," so he understood the stress and anxiety of serving the country overseas and then returning home to the stress of family life and trying to find work. Cole continued: "And you're also dealing with your internal issues as far as your depression, your anxiety and you believe you have PTSD of

9

some sort, right?" Robert answered: "Yes." Cole added: "And then you have a newborn baby, right? . . . So you, um, you're probably under the most stress out of anyone I've talked to in a long time." Robert agreed. After Cole said he did not believe defendant was the one who hurt their son, Robert admitted: "I did have a PTSD moment last night."

Robert then described hitting the back of A.'s head against a wall, initially making it seem like an accident: "I grabbed him and I think, uh, when I grabbed him from the couch, he hit his back of his head on the wall, when I went and turned. And I - he didn't make any noise. There was no crying. I thought he was perfectly fine." Robert claimed he was having an anxiety attack and "started seeing people," so he picked up A. to protect him. Holding A. against his right shoulder, Robert turned too quickly and did an unintentional "shoulder check" into the wall, hitting the back of A.'s head against the wall in the process. Robert said it did "seem odd" that A. did not cry after the impact, but he "wasn't thinking clearly" and "felt ashamed," so he did not tell defendant about it. Robert also agreed that after A.'s body "went limp" and he started "making a strange cooing noise," it occurred to him to get medical care for his son, but instead, as he explained: "I was about to go to bed. [¶] . . . [¶] . . . And I kind of brushed it off."

Sergeant Cole told Robert that he believed he was telling the truth about hitting A.'s head against the wall, but that he was "not quite owning all of it." Cole suggested: "Something happened last night, man. You were upset. Maybe it's because you're fighting with [defendant]. Maybe she's being - maybe she's being extremely difficult and then she's going to bed and you're stuck with the baby, 'cause she's got her migraine. She's not talking to you? But something else happened that you're not telling me about. This isn't just the - the PTSD thing, man." Robert then revealed the argument he had with defendant, disarming her when she "grabbed one of the knives and threatened to kill herself," and convincing her to go lie down. After defendant did so, Robert tried to calm down himself. Then A. started crying. Robert admitted feeling

10

"overwhelmed," but denied hitting A.'s head against the wall on purpose. Cole pressed Robert: "Your son deserves to know that you came in here and told the truth. You made a mistake, you were frustrated, you took it out on [A.] People are gonna understand all the pressure that you're under, but don't come 90 percent of the way and then lie about what happened." Robert responded: "I was frustrated and yeah I hit him - his head against the wall."

### Postinterview Conversation

After the interviews, defendant was allowed to join Robert in his interview room. They were left alone in the room and their conversation was recorded. Robert started by apologizing and saying: "It's my fault." Defendant responded: "No, it's mine." They then told each other about the impacts to A.'s head separately inflicted by each parent, after which defendant said: "We should have gotten him attention last night. We should have gotten him attention when I hit him on the head because he hasn't been acting normal." After some further discussion about who was to blame for A.'s condition, defendant said: "He doesn't sleep for six hours at a time through the whole day. Since Christmas Eve he has. We both should [have] called, the moment that it happened. From both times."

DISCUSSION

I

### Sufficiency of the Evidence

Defendant contends the evidence is insufficient to support her convictions because there is no substantial evidence that her actions caused A.'s death. She is mistaken.

The standard of review is well-settled: "When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently

11

for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt.  [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

" 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]' [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict.  [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence.  [Citation.]  We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]' [Citation.]  'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]' [Citation.]  Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.  [Citation.]" (*Id.* at pp. 357-358.)

Defendant was convicted of both murder and assault on a child causing death.  "Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  "[M]alice may be express or implied."  (§ 188, subd. (a).)  Express malice "requires an *intent to kill* that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶]  Malice is implied when an unlawful killing results from a willful act, the natural and probable

12

consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

Section 273ab sets forth the separate crime of assault on a child causing death. It provides in relevant part: "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." (§ 273ab, subd. (a).) This is not a murder statute, but " 'is more akin to a child abuse homicide statute.' " (*People v. Norman* (2003) 109 Cal.App.4th 221, 229, quoting *People v. Albritton* (1998) 67 Cal.App.4th 647, 659.)

As the jury was properly instructed, both crimes required proof of causation. "Tort principles of proximate or legal causation apply to crimes; thus, the defendant's acts must be the legally responsible cause of the injury, death, or other harm constituting the crime. [Citation.] 'To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical. [Citations.]' [Citation.]" (*People v. Moncada* (2012) 210 Cal.App.4th 1124, 1132.)

Defendant argues "the medical testimony the prosecution offered in no way proved beyond a reasonable doubt that [her] act was a substantial factor in [A.'s] death." This is so, she argues, because (1) both of the prosecution's medical experts testified that her act of shaking A. did not cause his injuries, and (2) the theory that her act of hitting A.'s head against the chair and Robert's act of hitting his head against the wall combined to cause the child's death is undermined by the fact that the bruising on his head was located on the sides of the head, as opposed to the back, where defendant claims she hit his head against the chair. We are not persuaded.

We acknowledge that shaking alone did not cause A.'s death. Dr. Coulter testified that he could not say for certain whether the injuries suffered by A. were predominantly

13

caused by "a shaking event versus an impact event," but that could be determined during an autopsy. As previously stated, the forensic pathologist determined A. died from "blunt impact head injuries." Defendant admitted A.'s head struck the back of the chair when she shook him one or two days before Christmas. This was two or three days before Robert hit A.'s head against the wall. In the meantime, as defendant candidly admitted, A. was not "acting normal." She told Robert after their police interviews: "He doesn't sleep for six hours at a time through the whole day. Since Christmas Eve he has. We both should [have] called, the moment that it happened. From both times." Returning to the forensic pathologist's testimony, when asked on cross-examination whether he could determine "which of those impacts," i.e., the impacts evidenced by bruising on the left versus the right side of A.'s temporal scalp, "was the primary cause of the injury to the brain," the pathologist answered: "No. My opinion is that they all kind of play their part."

However, as our Supreme Court has explained, the jury "need not determine which of the concurrent causes was the principal or primary cause of death. Rather, it is required that the cause was a substantial factor contributing to the result: ' "[N]o cause will receive judicial recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a *substantial factor* in bringing about the particular result." ' [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 155.) Based on the evidence recounted above, a reasonable jury could have concluded the impact inflicted by defendant was a substantial factor contributing to A.'s death.

Nor are we persuaded by defendant's argument regarding the placement of the bruising on A.'s scalp. She does not cite this court to any conclusive evidence that her shaking of A. resulted in the child striking the *back* of his head against the chair as opposed to the right or left side. She told Investigator Bishop that A.'s head hit the back of the chair on "the corner of it." And while they were talking over each other during this portion of the interview, she appears to have indicated that it was the back of A.'s head

14

that hit the chair. Nevertheless, it is entirely possible that defendant, frustrated enough by A.'s crying to lose control and shake the child, was not paying the closest attention to the precise place on A.'s head that made contact with the chair. His head could easily have turned during the shaking and made contact with the corner of the chair on the left or right side. Indeed, the fact that this is where the bruising was located is strong evidence that the side of his head struck the corner of the chair. The jury was certainly not required to believe the impact inflicted by defendant was so minor as to not leave a bruise, particularly in light of her description of that impact and the change in A.'s behavior that followed.

We conclude the evidence is sufficient to support the jury's finding that defendant's conduct was a substantial factor contributing to A.'s death.

## II

### *Failure to Instruct on Involuntary Manslaughter*

Defendant also claims the trial court prejudicially erred by failing to instruct the jury, sua sponte, on involuntary manslaughter. We disagree.

The trial court possesses a sua sponte duty to instruct on all lesser included offenses " 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*Id*. at p. 162.) Whether or not a reasonable jury could have so concluded based on the evidence in this

case is a matter we determine de novo. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

As previously stated, murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "[M]alice may be express or implied." (§ 188, subd. (a).) Express malice "requires an *intent to kill* that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore*, *supra*, 59 Cal.4th at p. 133.)

Involuntary manslaughter is a lesser included offense of murder. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*).) As relevant here, it is "the unlawful killing of a human being without malice" occurring "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192.) "Although the statutory language appears to exclude killings committed in the course of a felony, the Supreme Court has interpreted section 192 broadly to encompass an unintentional killing in the course of a noninherently dangerous felony committed without due caution or circumspection." (*Brothers*, at p. 31.)

Moreover, although the felony-murder rule generally makes an unintentional killing in the course of an inherently dangerous felony " 'either first or second degree murder, depending on the felony committed,' " regardless of the presence or absence of malice, where that underlying "inherently dangerous felony 'is assaultive in nature' [citation], the felony-murder rule does not apply, and a defendant may not be found guilty of murder without proof of malice." (*People v. Bryant* (2013) 56 Cal.4th 959, 965-966.) And where malice is lacking in such a case, the crime is not voluntary manslaughter because that crime requires the presence of malice that "is nevertheless reduced or mitigated to manslaughter" by either adequate provocation or imperfect self-defense. (*Id.*

16

at p. 968.) The resulting crime is therefore involuntary manslaughter. (*Brothers*, *supra*, 236 Cal.App.4th at pp. 33-34.) "Accordingly, an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Id.* at p. 34.)

We assume for purposes of analysis that assault on an infant is an inherently dangerous assaultive felony. The question, therefore, is whether or not a rational jury could have had reasonable doubt that defendant acted with implied malice. Defendant argues such a jury could have had reasonable doubt that she was subjectively aware of, and consciously disregarded, the danger to human life created by either the "brief shaking of [A.]" or "her failure to seek medical attention until December 27." In response, the Attorney General argues "angrily shaking an infant, hitting their head on a wooden chair, and then doing nothing for several days despite recognizing symptoms of traumatic brain injury is implied malice." The Attorney General has the better argument.

It is, of course, possible that defendant was subjectively unaware that shaking an infant places that infant's life in danger. But that possibility is not sufficient to require instruction on involuntary manslaughter. What is required is some substantial evidence supporting the theory that defendant was not in fact aware of such an obvious danger. (See *People v. Breverman*, *supra*, 19 Cal.4th at p. 162 [instructions on a lesser included offense are required only when there is substantial evidence that the defendant is guilty of the lesser offense, but not the greater offense].) Defendant has pointed this court to no such evidence, nor have we found any on our own. Moreover, it was not the simple act of shaking A. that resulted in defendant's liability for murder. Defendant shook A. with enough force to cause his head to strike the back of a wooden chair. As defendant explained to police, the impact "made a really loud thud" and moved the chair. Then, despite noticing A. was not eating normally and was sleeping significantly more than usual, defendant did not seek medical assistance for her son. Instead, she simply hoped

17

"he would be just okay." Defendant told Robert after their interviews with police: "We should have gotten [A.] attention when I hit him on the head because he hasn't been acting normal." Then she said: "He doesn't sleep for six hours at a time through the whole day. Since Christmas Eve he has." Far from evidencing a lack of knowledge of the danger her actions posed to A.'s life, these statements established quite convincingly that she possessed such knowledge and consciously disregarded it.

"Because the evidence presented at trial did not raise a material issue as to whether defendant acted without malice, the trial court was not obliged, on its own initiative, to instruct the jury on involuntary manslaughter." (*People v. Cook* (2006) 39 Cal.4th 566, 597.)

### III

### *Failure to Provide a Unanimity Instruction*

Defendant further asserts that the trial court prejudicially erred by failing to provide the jury with a unanimity instruction. Any assumed error in this regard was harmless.

A criminal defendant has a constitutional right to a unanimous jury verdict, meaning "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Thus, "if one criminal act is charged, but the evidence tends to show the commission of more than one such act, '*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.' [Citations.]" (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114.) In such a case, where no election has been made by the prosecution, the trial court possesses a sua sponte duty to provide a unanimity instruction. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274-275.)

However, there is an exception to this instructional duty. "Even when the prosecution proves more unlawful acts than were charged, no unanimity instruction is

18

required where the acts proved constitute a continuous course of conduct." (*People v. Napoles*, *supra*, 104 Cal.App.4th at p. 115.) " 'This exception arises in two contexts. The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]' " (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1309.)

Defendant argues "one reasonable view of the evidence was that the charges did not arise out of multiple incidents in a continuous course of conduct," but instead arose out of two separate criminal acts, "an act of assault, and an act of failure to obtain care, that were unrelated to each other." Elaborating on this theory, defendant suggests one juror might have concluded she assaulted A. by shaking him and hitting his head against the chair, and knowing this conduct placed his life in danger, nevertheless failed to summon medical aid. However, the theory goes, another juror might have concluded defendant's assault on A. did not cause significant injury, such that her failure to summon medical aid at that point in time likewise did not cause any harm. That juror, defendant continues, could nevertheless have concluded her failure to seek medical aid when A. first showed signs of distress on the morning of December 27, as opposed to three hours later when he stopped breathing, was the criminal failure to act that caused his death.

We question whether a rational juror who was not convinced defendant's assault on A., and related failure to seek medical aid after that assault, significantly contributed to his death could nevertheless have premised liability for murder on her failure to immediately seek aid on December 27 when, by all accounts, she was not aware of Robert's assault on the child the night before. However, we need not determine whether substantial evidence exists to support this theoretically separate factual basis for murder liability because any assumed error in failing to provide a unanimity instruction was manifestly harmless. This is because the jury also convicted defendant of assault on a child causing death. By convicting defendant of that crime, each juror necessarily found

19

she assaulted A. and that assault was a substantial factor contributing to his death.  Stated simply, even assuming the evidence supported the giving of a unanimity instruction in this case, the trial court's failure to provide one could not have prejudiced defendant. (See *People v. Lueth* (2012) 206 Cal.App.4th 189, 199 [failure to instruct on unanimity harmless where some jurors might have believed one factual basis for conviction but all necessarily also believed the other factual basis].)

DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare a corrected abstract of judgment reflecting a sentence of 25 years to life was imposed on count 2 (assault on a child causing death) and a stayed sentence of 15 years to life was imposed on count 1 (second degree murder), and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


　　　　　　　　　　　 /s/
　　　　　　　　　　　 HOCH, J.



We concur:



 /s/
BLEASE, Acting P. J.



 /s/
MAURO, J.