Filed 5/25/22  P. v. Leyva CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>EDDIE LEYVA,<br><br>  Defendant and Appellant. | F081984<br><br>(Super. Ct. No. BF158097A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Eddie Leyva and his girlfriend, Vanessa Wolfe, were arrested in 2014 in connection with the death of their three-month-old daughter, Adenalie. They were jointly charged with second degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (b); count 1),[1] assault on a child causing death (§ 273ab; count 2), felony child endangerment of Adenalie (§ 273a, subd. (a); count 3), and misdemeanor child endangerment of Adenalie's three siblings (§ 273a, subd. (b); count 4). As to defendant, count 3 included an enhancement for personal infliction of great bodily injury. (§ 12022.7, subd. (d).) Defendant and Wolfe were tried together before separate juries. Wolfe is not a party to this appeal.[2]

After jury selection but prior to the commencement of evidence, the trial court dismissed counts 3 and 4 on the prosecution's motion. (Former section 1385.)[3] During jury deliberations, the trial court declared a mistrial on both counts. Count 2 was subsequently dismissed and defendant was retried on count 1. The jury convicted defendant of second degree murder, and the trial court sentenced him to an indeterminate term of 15 years to life.

Defendant advances one claim on appeal: the trial court erred when it refused his request for a unanimity instruction, in violation of his rights under state and federal law, and the error was prejudicial. The People contend that a unanimity instruction is not required where, as here, the prosecutor is proceeding on multiple theories but there is only one discrete crime. They also contend that the continuous conduct exception applies in this case and that any error was harmless.

---

[1]    All further statutory references are to the Penal Code.

[2]    Wolfe was convicted and her appeal is pending in case No. F081098. (Evid. Code, §§ 452, subd. (d), 459

[3]    Section 1385 was amended effective January 1, 2022, by Senate Bill No. 81 (2021–2022 Reg. Sess.) Statutes 2021, chapter 721, section 1.

For the reasons set forth below, we conclude that a unanimity instruction was not required. Therefore, we reject defendant's claim of error and affirm the judgment.

## FACTUAL SUMMARY

### I. Prosecution Case

#### A. Events Prior to Adenalie's Death

Adenalie was born prematurely at 36 weeks on July 22, 2014. She weighed five pounds eight ounces, which was in the 10 to 25th percentile for weight and considered low. Adenalie had numerous conditions common in premature babies and was admitted to the neonatal intensive care unit (NICU) for respiratory distress syndrome, IDM (infant of diabetic mother),[4] and a systemic infection (sepsis). She remained there for approximately 26 days and required a mechanical ventilator, medication delivered to her lungs through a tube, intravenous nutrition, a feeding tube, and antibiotics. While in the NICU, Adenalie had multiple episodes of apnea and bradycardia, which is a slower heartbeat that typically follows the apnea; tachypnea, which is excessive rapid breathing; feeding issues due to tiring and failing to complete her feedings; oxygen desaturation; and jaundice.

Adenalie was discharged from the hospital on August 18, 2014, with a prescription for liquid vitamins and an iron supplement. She had gained eight ounces in the hospital and although she gained less weight than she should have, she was healthy, had no remaining complications and was able to take a bottle. Prior to her discharge, defendant and his sister, R.L., were instructed on how to care for Adenalie and they watched an informational video. Instructions included feeding Adenalie in a sitting position rather than flat on her back, keeping an eye on her breathing, and making sure she was urinating and defecating regularly. Adenalie's treating physician testified parents are also advised

---

[4] Adenalie's treating physician explained that IDM infants are more likely to have breathing difficulties at birth, feeding issues, and jaundice, among other issues.

that NICU babies are at an increased risk for certain complications, especially viral infections; to follow up with a pediatrician two to four days after discharge because feeding problems increase jaundice; and to seek medical care if any issues arise.

On September 19, 2014, defendant and Wolfe took Adenalie to the emergency room at around 4:00 a.m. They told the nurse who examined Adenalie that she had not had a bowel movement in three days and had been fussy for two days. Adenalie weighed seven pounds one ounce, and the examining nurse testified that she was small but not emaciated. She was breathing normally, was responsive, and did not have any bruises. Adenalie was given a glycerin suppository, and defendant and Wolfe were told to follow up with Adenalie's primary care doctor and return to the emergency room if the problem continued. The nurse testified that she would never suggest squeezing Adenalie to force her to have a bowel movement, and, as a mandated reporter, she did not notice anything concerning.

On October 29, 2014, the day before Adenalie died, defendant, Wolfe, and their children visited defendant's maternal grandmother's house.[5] Defendant's mother, L.L., was there, too, and R.L. came by for an hour or so. When R.L. first arrived, Wolfe's three-year-old son, F., tipped the stroller over with Adenalie in it. She was strapped into her car seat, which was attached to the stroller, so she did not fall out, but she cried after being tipped over. R.L. was unsure if she was hurt from the fall.

Adenaline cried the entire time R.L. was there, but she did not notice anything else unusual. She and L.L. both tried to soothe Adenalie. R.L. also tried to feed Adenalie, who took the bottle but then pushed it out of her mouth with her tongue.

At that time, defendant, Wolfe and the four children were living in the one-bedroom apartment of L.L.'s fiancé, D.B. L.L. testified that she held Adenalie that night

---

[5] In addition to Adenalie, defendant and Wolfe had a one-year-old son, O., together. Wolfe also had a three-year-old son, F., and a seven-year-old daughter, S.

at D.B.'s apartment and Adenalie was acting "[n]ormal" but crying a lot. Adenalie drank from the bottle L.L. gave her and she slept the night next to L.L. in bed.

L.L. testified that Adenalie looked healthy and was always a "petite" baby. L.L. denied that Adenalie appeared skeletal or that she told the lead investigator that Adenalie looked like a skeleton. She stated that when she testified in a prior proceeding that she knew Adenalie was sick, she was referring to Adenalie's prematurity. When L.L. left for her mother's house between 8:00 and 9:00 a.m. the next morning, Adenalie was in her swing in the living room, and L.L. kissed her on the head.

## B.    Adenalie's Death

On October 30, 2014, at around noon, D.B. was about to get into the shower when he heard Wolfe scream. She told him Adenalie was not breathing, and he took Adenalie from her. Adenalie felt cold, and D.B. could feel her ribs and bones as he rubbed her chest. D.B. testified he called 911. Wolfe spoke to the dispatcher and said her daughter was not breathing and was cold. D.B. then left, explaining at trial that he had a warrant out for his arrest and went to his mother's house.

Paramedics and police arrived shortly thereafter. Adenalie had no pulse and was not breathing. She was in rigor mortis, lividity was present on the back of her legs, and there was a white cluster of fly eggs visible on the back of her tongue. She also had two visible bruises on her face, to which the paramedic alerted police because it was a "red flag." Although no precise time of death was established, the rigor mortis and presence of fly eggs suggested Adenalie died at least several hours before Wolfe called 911. Adenalie weighed just under four and one-half pounds.

The homicide detective who responded to the scene described the small apartment as "pretty dirty" and not "a hospitable environment for children." In the living room where the family slept, there were two chairs turned toward one another and covered with

5.

bedding, with what appeared to be fresh animal feces on top.**6** There was food in the apartment, however, along with two strollers, diapers, infant formula, baby bottles, and a partially full bottle of gas relief for infants. Police found one pink baby bottle that had been fashioned into a smoking device for narcotics or marijuana, and there was some type of residue in the bottom but no methamphetamine was located in the apartment.

Defendant was arrested several blocks away from the apartment. He was carrying two young boys. During his recorded interrogation later that night, which was played for the jury, defendant admitted to police that he had a temper and he said he was bipolar. He denied directing his temper toward the children, but eventually he admitted getting frustrated with Adenalie's crying and said he could possibly have caused the bruises on her face by holding her too tightly while arguing with Wolfe. When told by detectives that Wolfe said he had Adenalie by the throat in a rage five times, he said it could have happened in the heat of an argument with Wolfe while he was holding Adenalie with more force than he realized. He also said he squeezed Adenalie's abdomen to get her to defecate, although not hard.

## C.    Witness Testimony on Adenalie's Care

Prior to Adenalie's birth, defendant, Wolfe, O., F., and S. were staying with R.L. In early to mid-September, following Adenalie's birth, R.L. moved out of her apartment. However, during the time the family lived with her prior to the move, Adenalie slept a lot and appeared happy. Although Adenalie would drink her bottle too quickly, forget to take a breath, and choke, R.L., who had seven children of her own, did not think Adenalie cried a lot. She recalled telling the lead investigator that Adenalie cried a lot but said she was referring to the period after the family moved out of her apartment.

After R.L. moved, defendant, Wolfe, and the four children began staying with D.B. in his one-bedroom, one-bathroom apartment. They slept in the living room while

---

**6**    D.B. testified he had a puppy.

D.B., and sometimes L.L., occupied the bedroom. Defendant, D.B., and L.L. used methamphetamine during this period, although the extent of their usage was not clear.

D.B. testified that Adenalie was small and cried a lot, like she was in pain. He had grown children of his own and felt that Adenalie should have remained hospitalized given her prematurity and thinness. D.B. initially testified that Adenalie looked healthy and when shown a photo of Adenalie after her death, he became upset and said he did not remember her looking like that. He subsequently conceded that he knew Adenalie was sick because of her cries and how she looked, but said he never saw her unclothed and he never fed her or changed her diapers.

L.L. stayed at D.B.'s apartment sometimes and with her mother at other times. She helped take care of Adenalie, and said Adenalie was beautiful, healthy, and did not look sick. She denied that Adenalie cried a lot.

R.L., L.L., and D.B. all described Wolfe as a neglectful, uncaring mother to Adenalie. D.B. testified that defendant took care of Adenalie while Wolfe did nothing but sit around smoking cigarettes. D.B. said defendant would hold Adenalie when she cried or hand her to L.L., and defendant tried to comfort her. D.B. never saw defendant and Wolfe argue or fight, but heard Wolfe call Adenalie a "'little bitch,'" tell Adenalie to shut up, and say she never wanted Adenalie. Defendant did not like it when Wolfe said those things and would get upset. D.B. denied ever seeing defendant yell at Adenalie or choke, squeeze, shake, or otherwise act violently toward her. He testified defendant was a good father and did everything for the kids.

L.L. also testified that defendant did everything—childcare, cooking, cleaning, laundry—while Wolfe sat around and smoked. L.L. said Wolfe acted like she did not want to be a mother, she was mean to the children, she hit F. and S., and she yelled at Adenalie. When Adenalie cried, Wolfe would say, "'There she goes again,'" "'[s]hut up,'" and "'[a]ll you ever do is cry.'" She testified that Wolfe was argumentative with everyone rather than "violent violent," and that Wolfe yelled and swore. Defendant also

7.

had a temper, but L.L. said it was never directed toward Adenalie or the other children and she denied defendant ever hit, shook, squeezed, strangled, or choked Adenalie.

R.L. testified that defendant primarily cared for the three older children while Wolfe primarily cared for Adenalie. R.L. described Wolfe as loving and motherly toward F. and O., but not Adenalie; and R.L. said Wolfe did not want to take care of Adenalie. Both parents had tempers and would yell at each other, but R.L. denied ever seeing defendant being abusive toward Adenalie.

R.L. testified that in late September or early October, Adenalie sometimes cried like something was wrong and sometimes cried like she was hungry. Adenalie seemed uncomfortable and would cry even after feedings, which R.L. assumed was gas. According to R.L., the majority of Adenalie's painful cries occurred just before the end of October, and Adenalie did not look healthy the last week of her life. Her face looked thinner, but R.L. did not see her body.

R.L. thought Wolfe was too rough when she rocked Adenalie, and on approximately five occasions, including the day before Adenalie died, R.L. saw Wolfe put Adenalie on her knees or lap area and shake Adenalie up and down, hard and fast while she patted Adenalie's back. R.L. testified Wolfe was frustrated with Adenalie and was not trying to burp her. However, R.L. never saw Wolfe squeeze Adenalie's chest. R.L. told Wolfe she should be gentler, but Wolfe ignored her. R.L. was worried about Adenalie the last week of her life, when she looked "'horribly skinny,'" in the face, and defendant said he knew when she told him he needed to take better care of Adenalie. When R.L. would tell defendant that Wolfe was too rough with Adenalie, they would argue over it and defendant would tell R.L. that Adenalie was their baby.

Wolfe's oldest son, F., was three years old when Adenalie died and nine years old at trial. He testified that defendant would get mad and choke Adenalie, which made her cry, but Wolfe never did anything to her. On cross-examination, F. testified he saw and talked to Wolfe regularly, and they talked about defendant a lot. They also talked about

8.

defendant at the police station after Adenalie died. He recalled stating that he did not remember if defendant did anything to Adenalie or choked her, and he was truthful then.

A social worker and forensic interviewer with the county also testified. She interviewed F. four days after Adenalie died and their videotaped interview was played for the jury. Some of F.'s answers were nonresponsive, such as when he was asked what happened when defendant got mad and he appeared to say, "my binkie cool." Other answers, such as when he identified a photograph of a girl as a boy, were incorrect. However, F. said defendant got mad and choked "baby girl" at "her grandma house." He also said the baby cried a lot, and defendant "[h]urt baby girl." The social worker agreed that children are susceptible to influence and can have false memories, but they are also truthful about what they witness and it was F. who brought up defendant choking the baby.

### D. Forensic Pathologist's Testimony

Adenalie's autopsy was conducted on October 31, 2014, by Dr. Eugene Carpenter, a forensic pathologist with the Kern County Sheriff's Department, Coroner Division. Dr. Carpenter explained that an autopsy is conducted "[t]o determine the cause and manner of death," and he described the five manner-of-death categories: undetermined, which is rare; natural; accident; suicide; and homicide, which is a medical determination rather than a legal one.

Adenalie was around three months one week old when she died. She was 50 centimeters in length, which was within the normal range for her age, but she weighed just under four and one-half pounds, which was "extremely low" for her age. Externally, Adenalie appeared "extremely dehydrated," had "no fat," and appeared "near emaciation, near starvation …." She had what appeared to be scars on her cheek, older bruises on her upper left cheek and lower left cheek, a fresh fingernail cut on her chin, and a fresh abrasion on her chin. She also had a speckled area of injury above her pelvic bone that was not considered suspicious.

9.

Internally, there was evidence of a nonlethal, healing, blunt force injury to the back of Adenalie's head, and she had 16 fractured ribs that were healing. She also had an acute infection in her right kidney, which was visibly swollen and filled with a significant amount of pus; she had no food in her system from mouth to anus; and she was suffering from a severe lack of nutrition. Adenalie tested positive for influenza A, and she had a low level of methamphetamine in her system.[7]

After Adenalie's autopsy, Dr. Carpenter was considering whether her death was undetermined or possibly a homicide by smothering, which can be undetectable. In an email in early November 2014, he wrote that there were "'probable lethal-level right kidney infection signs,'" "'[w]hich would explain the appearance of neglect and why the infant wasn't feeding.'" He also wrote, "'The ribs have been fractured in the past and there is blunt trauma to the head,'" "'but it will be questionable as whether and how that may have contributed to the death.'" "'The chest trauma in the past is very severe, but probably must be seen as healed and not contributing to death.'" "'The head trauma can be argued to be where the sick baby lay on its head for a long time while sick.'" "'The mode can't be natural, but probably will be undetermined.'"

At trial, he explained the email was precautionary and it was the only time he had written one like that, but it was a one-of-a-kind case and he was focused on whether Adenalie's parents would be accused of ignoring her. Although Adenalie had been injured, he was leaning toward an undetermined, more natural death given that a healed injury cannot be considered as contributing to the death; and, because he did not have a mechanism for her death despite her injuries, he wanted his thought process to be clear. He explained he did not mention pneumonia in the email because he had not yet

---

[7] Regarding the low level of methamphetamine in her blood listed on her death certificate, Dr. Carpenter explained it would be a questionable practice to exclude it from the death certificate because it was an unknown factor. However, there was no proof it contributed to her death and it could have come from breathing secondhand smoke.

discovered it.  With respect to the head trauma comment, he explained he was simply stating what someone might argue.  However, he would argue that there was no external sore and there was periosteal bleeding, or skull surface discoloration, which is sign of severe blunt trauma not seen with bedsores.

Subsequently, after soaking tissue from Adenalie's major organs in formalin for several weeks, Dr. Carpenter sectioned the lobes of her lungs and found signs of severe bronchopneumonia, a bacterial infection, in the lower lobe of her left lung.  The other sections had congestion but no signs of inflammation.  Although the influenza virus can cause pneumonia and viral pneumonia can turn into secondary bacterial pneumonia, Adenalie's lungs showed no signs of viral pneumonia and, based on a study he read, Dr. Carpenter believed Adenalie's positive influenza A antigen test was most likely a false positive in the absence of community spread.

Dr. Carpenter stated that kidney infections occur one of two ways.  They are almost always caused by bacteria entering through the urethra, but, alternatively, bacteria from another infected organ can enter the kidney through the bloodstream.  Bacteria in the bloodstream only temporarily is known as bacteremia while bacteria that remains is sepsis.  Dr. Carpenter could not say whether Adenalie had sepsis because it is "rarely helpful" to test for it postmortem.  Her urine was also not tested because that is not considered good practice postmortem, but her bladder showed no visible sign of inflammation.  He agreed bladder infections do not necessarily result in visible changes, a bladder infection could not be excluded, and it is rare for pneumonia to lead to a kidney infection, but he concluded that Adenalie's kidney was infected by bacteria in the bloodstream, which originated with the pneumonia lesion in her lung.

Fractures like Adenalie's are almost always associated with being tightly grasped and shaken with compression of the chest, and Dr. Carpenter opined that Adenalie was squeezed forcefully between 10 days and three weeks of her death.  Several of her ribs were fractured more than once, but he could not say whether all the fractures occurred

11.

during a single event. He explained that the compression required to break the ribs is violent, and a fall from a stroller or even a car crash would not cause the injury; it requires forceful squeezing at the baby's front and back with fingers digging into the back. He distinguished acute or fresh shaken baby syndrome, in which a baby is seriously injured or killed from being shaken. That injury is often accompanied by a subdural hematoma, retinal hemorrhaging, or bleeding around the optic nerve, and there were no such signs in Adenalie.

Even a single rib fracture significantly increases the risk of developing pneumonia because the pain interferes with the ability to take deep breaths, and deep breaths are necessary for the health of the lungs and the immune system. Premature infants are more susceptible to infection, and the injury to Adenalie's ribs would have made breathing difficult due to the pain. Dr. Carpenter explained that in children, deep breathing stops reflexively due to pain, and an infant with 16 rib fractures would be expected, over a prolonged period, to struggle to breathe, gasp for air, and refuse to take a bottle normally.

Despite the severity of her rib injuries, Adenalie had recovered enough by her death to be breathing properly. However, Dr. Carpenter concluded that in her case, the rib fractures caused the pneumonia, which in turn was lethal. He testified that Adenalie's cause of death were the infections in her lung and kidney, along with hunger and thirst. As a result of connecting the pneumonia to the rib fractures, Dr. Carpenter classified Adenalie's death as a medical homicide, meaning it was fully or partially caused by others. Adenalie's conditions were treatable and due to the ready availability of food and water for children, Dr. Carpenter described the circumstances of Adenalie's death as "[e]xtremely rare" and "a neglect case of the most extreme nature."

## II. Defense Case

Dr. Katherine Raven, a forensic pathologist for Sacramento County who also contracted with Alameda and San Mateo Counties and had a private consulting firm, was the defense's sole witness. Dr. Raven agreed with most of Dr. Carpenter's opinions and

with the contents of his email, but she disagreed with his classification of Adenalie's death as medical homicide based on a linkage between the rib fractures and the pneumonia. Dr. Raven testified she would classify Adenalie's death as undetermined, which she disagreed was rare and said was used in around 10 to 15 percent of cases. She stated that Adenalie's case was very complicated, and her death could not be classified as natural given the presence of adult-inflicted injuries. However, the injuries were not acute and, in her opinion, did not directly or indirectly cause Adenalie's death.

Adenalie had a kidney infection and pneumonia in one lobe of her lung, and the immediate cause, or mechanism, of her death was severe, overwhelming infection. Adenalie was also severely emaciated when she died, although she was still making some urine because her diaper was wet. Dr. Raven testified that it was not possible to determine the degree of emaciation postmortem because dehydration is assessed based on electrolytes and those change after death. However, severe infection can cause loss of appetite, leading to emaciation. Dr. Raven testified it would have taken Adenalie seven to 10 days, and at least seven days, to lose approximately half of her body weight; and she could have survived had she received medical care during that time period.

With respect to Adenalie's injuries, her facial bruises were at least 72 hours old and were blunt injuries consistent with an adult hand grabbing her cheek. There was also evidence of a hemorrhage at the back of Adenalie's head, but it was difficult to say whether or not it was a pressure sore because it was an old injury. Finally, Adenalie had 16 fractured ribs, which would have been painful when acute, but were healing at the time of her death.

Dr. Raven agreed with Dr. Carpenter that the rib fractures were an inflicted injury caused by extreme chest compression, with squeezing being the most common mechanism in infants; and the fractures were consistent with multiple assaults. Although severe shaking can fracture the ribs, it is less common; fractures are not diagnostic of shaking; and with shaking severe enough to fracture ribs, Dr. Raven would expect to see

13.

signs of brain injury. However, there was no evidence of shaking in Adenalie, such as head or neck injury, and Dr. Raven did not think that the rib fractures could have been caused by squeezing Adenalie's abdomen to make her defecate because the fractures were up higher.

Dr. Raven testified the rib fractures were at least 10 days old because that is the point at which healing begins and the fractures were "well-healed." Based on the rib calluses, which form during the healing process and are then reabsorbed, Dr. Raven thought the fractures were between two and 12 weeks old, although she acknowledged Adenalie had no noted fractured ribs when discharged from the hospital after birth and had no acute abnormalities when seen at the emergency room on September 19, 2014. Even one rib fracture is painful when acute and when Adenalie's 16 ribs were fractured, she would have experienced pain when breathing in, and would have continuously cried and been very fussy.

Dr. Raven explained that any abnormality is considered significant when autopsying an infant, and Adenalie tested positive for influenza A postmortem and had methamphetamine in her blood. Flu season usually starts in October and although Dr. Raven could not exclude the flu as a contributing factor, its significance was unknown. The presence of methamphetamine in an infant is an extreme abnormality so also could not be ignored, but Dr. Raven did not know how much of a contributing factor it was.

The crux of Dr. Raven's disagreement with Dr. Carpenter was his classification of Adenalie's death as a homicide based on his conclusion that the inflicted rib fractures caused the pneumonia, which then led to the kidney infection and death. Dr. Raven testified that acute rib fractures, meaning under 24 hours old, can cause pneumonia but it is not common, and she did not believe Adenalie's nonacute rib fractures led to death, either directly or indirectly. She testified it was not possible to sequence the infections with any certainty, and she did not know if Adenalie had sepsis because it is difficult to

14.

diagnose after death given the normal growth of bacteria postmortem. However, she believed the kidney and lung infections were between one and three days old, and because the kidney infection was visibly more severe than the lung infection, which was seen only microscopically in one lobe, she theorized the kidney probably became infected first.

Dr. Raven explained that kidney infections are commonly caused by bladder infections in infants and as that is the most common sequence, it was her opinion that the infection probably spread from Adenalie's bladder to kidney. From there, the bacteria probably entered Adenalie's bloodstream and led to sepsis, which then seeded the lungs with bacteria and resulted in the pneumonia. Dr. Raven disagreed that lack of gross inflammation in the bladder excluded infection because, unlike with kidneys and lungs, the bladder is a sac and the infection is in the urine.

Finally, kidney infections are usually very painful and touching or hitting the kidney area would have caused a lot of pain. Kidney infections are also accompanied by general lethargy, difficulty with eating or not wanting to eat, and not wanting to take a bottle. This could have caused dehydration, although Dr. Raven noted that, conversely, dehydration can cause kidney infections.

## DISCUSSION

### I.      Background

The trial court instructed the jury on second degree murder and, over the prosecutor's objection, involuntary manslaughter. With respect to murder, the court instructed the jury as follows pursuant to CALCRIM No. 520:

> "The defendant is charged with murder, in violation of Penal Code Section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that:

> "*1A, the defendant committed an act that caused the death of another person*;

15.

"*Or, 1B, the defendant had a legal duty to help or care for Adenalie [L.] and the defendant failed to perform that duty and that failure caused the death of Adenalie [L.]*;

"And, two, when the defendant acted or failed to act, he had a state of mind called malice aforethought.

"There are two kinds of malice aforethought:  Express malice and implied malice.  Proof of either is sufficient to establish the state of mind required for murder.

"The defendant had express malice if he unlawfully intended to kill.

"The defendant had implied malice if:

"One, he intentionally committed the act or failed to act;

"Two, the natural and probable consequences of the act or failure to act were dangerous to human life;

"Three, at the time he acted or failed to act, he knew his act or failure to act was dangerous to human life;

"And, four, he deliberately acted or failed to act with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim.  It is a mental state that must be formed before the act that causes death is committed.  It does not require deliberation or the passage of any particular period of time.

"An act or failure to act causes death if the death is the direct, natural, and probable consequence of the act or failure to act and the death would not have happened without the act or failure to act.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

"There may be more than one cause of death.  An act or a failure to act causes death only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor; however, it does not need to be the only factor that causes the death.

16.

"A parent has a legal duty to help or care for his or her child.· If you conclude that the defendant owed a duty to Adenalie [L.] and the defendant failed to perform that duty, then his failure to act was the same as doing an injurious act.

"If you find the defendant guilty of murder, it is murder of the second degree."  (Italics added.)

After the prosecutor delivered her closing statement and in light of the court's instruction on the jury's need to find 1A or 1B, defense counsel requested a unanimity instruction.[8]  The prosecutor objected on the ground that the jury did not have to agree on the murder theory.  The trial court concluded that the unanimity instruction was appropriate and agreed to give it.

After defense counsel delivered her closing statement, but prior to rebuttal, the trial court stated that after further research, it was not going to give the unanimity instruction because the jury need not agree on theory.  Defense counsel objected.

Defendant now claims the failure to instruct on unanimity was prejudicial error. Based on the trial court's instruction on the actus reus as either 1A (commission of an act) or 1B (failure to perform a legal duty of care), defendant characterizes his alleged involvement in breaking Adenalie's ribs, which then led to pneumonia, as one theory of murder and his failure to obtain care as she declined from infection and refused to eat as the other theory, and he points out he offered two different defenses, denial as to 1A and lack of implied malice as to 1B.[9]  (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 879

---

[8]     The model jury instruction on unanimity, CALCRIM No. 3500, provides:  "The defendant is charged with _____*<insert description of alleged offense>* [in Count _____] [sometime during the period of _____ to _____].  [¶]  The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

[9]     In addition to disputing that defendant fractured Adenalie's ribs and that the rib fractures caused the pneumonia, defense counsel focused on persuading the jury to reject second degree murder in favor of involuntary manslaughter.

["[A] unanimity instruction is not required if 'the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed [the] defendant committed one act but disbelieved that he committed the other.'"].)

Defendant argues that a unanimity instruction was required in this case because "th[e] two alternatives were of a very different nature: the former involved an affirmatively assaultive act, the latter involved a failure to act. So, the conduct underlying each alternative was quite distinct. As the trial court initially—correctly— found, they do not merely describe varying theories of culpability, they describe wholly disparate behaviors." "[T]he conduct at issue was not just a series of acts that might not even, standing alone, constitute independent crimes. [Citations.] Rather, the conduct in 1A and 1B alleged discrete, independent courses of action, each of which could have been charged on its own," and "'the unanimity instruction is required if there are multiple acts shown that could have been charged as separate offenses.'" (Quoting *People v. Jenkins* (2000) 22 Cal.4th 900, 1025, citing *People v. Beardslee* (1991) 53 Cal.3d 68, 92.)

As we shall explain, defendant's argument is foreclosed under the law, and we reject it.

## II.  Standard of Review

We review allegations of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) "Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that … is … predominantly legal," and "should be examined without deference." (*People v. Waidla, supra*, at p. 733.)

18.

## III.    Analysis

### A.    Unanimity Instruction

"In a criminal case, a jury verdict must be unanimous" and "the jury must agree unanimously the defendant is guilty of a *specific* crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); accord, *Ramos v. Lousiana* (2020) ___ U.S. ___, ___ [140 S.Ct. 1390, *1397]; *People v. Covarrubias, supra*, 1 Cal.5th at pp. 877–878.) In California, "cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Russo, supra*, at p. 1132.) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*Ibid.*; accord, *People v. Covarrubias, supra*, at p. 878; *People v. Brown* (2017) 11 Cal.App.5th 332, 341.)

"'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.'" (*Russo, supra*, 25 Cal.4th at p. 1132.) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid.*)

"In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo, supra*, 25 Cal.4th at p. 1135.) As the court explained, "The crime of burglary provides a

good illustration of the difference between discrete crimes, which require a unanimity instruction, and theories of the case, which do not. Burglary requires an entry with a specified intent. [Citation.] If the evidence showed two different entries with burglarious intent, for example, one of a house on Elm Street on Tuesday and another of a house on Maple Street on Wednesday, the jury would have to unanimously find the defendant guilty of at least one of those acts. If, however, the evidence showed a single entry, but possible uncertainty as to the exact burglarious intent, that uncertainty would involve only the theory of the case and not require the unanimity instruction. [Citation.] Other typical examples include the rule that, to convict a defendant of first degree murder, the jury must unanimously agree on guilt of a specific murder but need not agree on a theory of premeditation or felony murder [citation], and the rule that the jury need not agree on whether the defendant was guilty as the direct perpetrator or as an aider and abettor as long as it agreed on a specific crime [citation]." (*Id.* at pp. 1132–1133.)

Relevant to the parties' arguments, where the need for either an election or a unanimity instruction is triggered, there is a continuous conduct exception. (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1178; accord, *People v. Hernandez* (2013) 217 Cal.App.4th 559, 572; *People v. Napoles* (2002) 104 Cal.App.4th 108, 115.) "This exception arises in two contexts. [Citation.] First, a unanimity instruction is not required when the criminal acts are so closely connected that they form part of the same transaction, and thus one offense. The second context occurs when the statute defines the offense to comprise a continuous course of conduct over a period of time." (*People v. Jo, supra*, at p. 1178; accord, *People v. Hernandez, supra*, at p. 572; *People v. Napoles, supra*, at pp. 115–116.)

## B.     No Error

This case involves one discrete crime of murder. (*People v. Covarrubias, supra*, 1 Cal.5th at p. 879; *People v. Grimes* (2016) 1 Cal.5th 698, 727.) Dr. Carpenter theorized that Adenalie's rib fractures led to the pneumonia, and the pneumonia led to the kidney infection. This sequence of events allowed him to conclude that Adenalie's death was a

medical homicide rather than undetermined. Although the defense expert, Dr. Raven, agreed with Dr. Carpenter in the main, she did not agree there was evidence from which to conclude that the pneumonia was caused by the healing rib fractures or that the pneumonia preceded the kidney infection. Based on the severity of the kidney infection, the comparatively less severe-appearing lung infection, and the most common sequence of events, Dr. Raven instead believed the kidney infection preceded the lung infection, and she would classify Adenalie's death as undetermined.

Irrespective of their differences of opinion on the role the rib fractures did or did not play, both experts agreed the rib fractures were healing and did not directly cause Adenalie's death. Rather, both agreed that Adenalie died from a combination of untreated infections that were likely survivable with treatment. During the approximately seven- to 10-day period it took Adenalie to lose almost half her body weight and become severely emaciated, she would have cried in pain and quit taking her bottle normally, as eyewitness testimony confirmed. While the rib fracture theory might explain why Adenalie developed pneumonia and then a kidney infection, it was her decline over a week or more, with outward signs of distress and significant weight loss, that formed the basis for defendant's criminal liability in this case, whether or not the jury believed that defendant fractured Adenalie's ribs or that the rib fractures led to pneumonia.

It is well established that a unanimity instruction is not required where there are multiple theories but only one discrete crime (e.g., *People v. McDaniel* (2021) 12 Cal.5th 97, 145; *People v. Armstrong* (2019) 6 Cal.5th 735, 794; *People v. Grimes, supra*, 1 Cal.5th at pp. 727–728), and a "jury need not unanimously agree on subsidiary factual issues, such as specific details of the act" (*People v. McDaniel, supra*, at p. 145). We are bound by this precedent (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197–198), and, therefore, even if the prosecutor had presented multiple theories of liability for Adenalie's death, there was only a single murder. Given that neither expert directly attributed Adenalie's death to her fractured ribs, however, and instead agreed she died of

untreated infection, we are not persuaded that this case in fact involved alternate theories of murder. To the contrary, the basis for defendant's criminal liability in this case was his failure to act.[10]

Accordingly, we reject defendant's claim that the trial court erred in refusing to instruct the jury on unanimity, in violation of his state and federal rights.[11] In light of this conclusion, it is unnecessary to address the parties' disagreement over whether the continuous course of conduct exception to the prosecutorial-election-or unanimity-instruction requirement applies to these facts (*People v. Jo, supra*, 15 Cal.App.5th at p. 1178; *People v. Hernandez, supra*, 217 Cal.App.4th at p. 572), or whether the asserted instructional error was prejudicial.

---

[10] Defendant does not claim that the jury was misinstructed on a theory not supported by the evidence or that the murder instruction misled or confused the jury; and on the facts of this case, any such claim would be harmless, even assuming error. (*People v. Aledamat* (2019) 8 Cal.5th 1, 7 [a "'"factually inadequate theory[]"' … is incorrect only because the evidence does not support it," and "'reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground'"]); *People v. Beltran* (2013) 56 Cal.4th 935, 955 ["'"[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v.*] *Watson* [(1956) 46 Cal.3d 818, 836].'"].)

[11] To the extent defendant's argument suggests he was entitled to a unanimity instruction merely because his alleged action in fracturing Adenalie's ribs and his alleged failure to act as her health declined could have supported two separate criminal charges, this mischaracterizes the concern underlying the need for a unanimity instruction in some cases. As explained, "The jury must agree on a 'particular crime[,]' [citation] … [b]ut unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.'" (*Russo, supra*, 25 Cal.4th at pp. 1134–1135.)

22.

## DISPOSITION

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

FRANSON, J.